UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:22 CR 394 SRC (JMB) |
| | ) | |
| FABRICE LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court is Defendant Fabrice Lewis's Motion to Suppress Statements and Physical Evidence.  [ECF No. 29]  The government opposes the motion.  Pretrial motions were referred to the undersigned United States Magistrate Judge.  See 28 U.S.C. § 636(b).

**INTRODUCTION AND PROCEDURAL BACKGROUND**

Fabrice Lewis is charged by Indictment with two counts of being a felon in possession of a firearm (Counts One and Four), one count of possessing with the intent to distribute crack cocaine (Count Two), and one count of possessing a firearm in furtherance of a drug trafficking crime (Count Three).  Count One relates to an encounter with the Pagedale, MO, Police on April 18, 2022, and Counts Two, Three, and Four flow from a traffic stop conducted by the University City, MO, Police on April 26, 2022.

On March 7, 2024, the undersigned held an evidentiary hearing on Lewis's motion.  Lewis was present with Assistant Federal Public Defender Bevy Beimdiek.  The government was represented by Assistant United States Attorney Jason Dunkel.  The government presented evidence and testimony through five witnesses—Corporal Justin Cull, Pagedale PD; Lieutenant

Dewey Rice, Ferguson PD; Sergeant Nicole Martin, Creve Coeur PD; Officer Caleb Johnson, University City PD; and Officer Michael Wamsganz, University City PD. [See ECF No. 55, Clerk's Witness List] The parties also introduced numerous exhibits. [See ECF No. 56, Clerk's Exhibit List] After the hearing, the parties submitted a Joint Stipulation of Facts Supplementing the Evidentiary Hearing Record Regarding Defendant's Motion to Suppress Statements and Physical Evidence. [ECF No. 61; hereinafter "Joint Stipulation of Facts"]

Based on the record before the Court, including the testimony and exhibits received in evidence, and having fully considered parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

### I.    April 18, 2022 – Midwest BankCentre, Pagedale

Justin Cull is presently a Corporal with the Pagedale Police Department. Corporal Cull was an Officer at the time in question and will be referred to herein as Officer Cull. Officer Cull has been with Pagedale for about seven years, and he has been a police officer since 2013. Dewey Rice is presently a Lieutenant with the Ferguson, MO, Police Department, but he was a Sergeant with Pagedale at the time of the events in question and will be referred to herein as Sgt. Rice. Sgt. Rice has been in law enforcement for approximately thirty years. He served in Pagedale from about 2019 to 2023.

In the afternoon of April 18, 2022, an employee at the Midwest BankCentre in Pagedale, MO, activated the silent holdup alarm. Officer Cull and Sgt. Rice, who were in separate patrol vehicles, responded to the bank. The officers received dispatch information regarding the alarm, including that a suspect (later identified as Fabrice Lewis) possibly had a firearm and had threatened a security guard. The information indicated that the suspect left the bank and then

returned.  Officer Cull and Sgt. Rice arrived at approximately the same time.

Officer Cull testified that when the officers first arrived, Lewis was near a vehicle.[1]  Officer Cull also testified that it appeared to him that Lewis was placing something into the vehicle.[2]  The officers initiated contact with Lewis but did not detain him or restrain him in any way.  Officer Cull testified that the focus of the officers' initial interaction was to ask Lewis about what was going on.

Thereafter, a bank security guard came out and identified Lewis as the person causing the issue.  At different times, Officer Cull and Sgt. Rice entered the bank and spoke with employees to gather facts relative to the alarm and the incident with Lewis.  While one officer was inside, the other officer was outside with Lewis. The Pagedale Officers testified that the Midwest BankCentre's video security system was not working, and they were unable to obtain a recording of the incident in question.

Officer Cull testified that he had safety concerns regarding Lewis and that he told Lewis to keep his hands out of his pockets.  The officers also kept Lewis from re-entering the bank.  Officer Cull testified that Lewis called the guard pejorative names.  Both officers testified that they took actions to de-escalate the situation.  Sgt. Rice explained that the security guard stood closer to the bank, and the officers kept Lewis closer to his vehicle.

Ultimately, the officers learned that Lewis had a dispute with the bank concerning an ATM deposit—apparently Lewis believed he was not properly credited for the amount of cash he believed he deposited.  The bank security guard told Sgt. Rice that Lewis had made a threatening

---

[1] Lewis's vehicle was a rented Toyota Corolla.

[2] Officer Cull acknowledged that his official report does not reflect this fact.

statement suggesting he was willing to shoot the guard.  Sgt. Rice thereafter asked Lewis if he had made the statement, and Lewis reportedly admitted that he had.  (See Tr. at 22-23; 51-52; 69-70)[3] During this time, Lewis was not placed in handcuffs or physically restrained, but he was not permitted to approach or reenter the bank.  Both Pagedale Officers testified that Lewis was free to leave during their initial investigation; they also testified that they may have pursued and arrested him once they believed they had enough information for an arrest.

After Lewis acknowledged that he made a threatening statement to the bank security guard, Sgt. Rice directed that Lewis be arrested for Assault Fourth.  (See Tr. at 50-52)  Officer Cull handcuffed Lewis and placed him in a patrol vehicle.[4]  The officers also conducted some additional investigation with bank employees.

Sergeant Rice testified that, after Lewis's arrest, he decided to tow the rental car Lewis was using.  The officers did not take any steps to determine if someone else could come and take the car for Lewis.  Sgt. Rice was an on-duty supervisor at the time, and he testified that he had the authority to make towing decisions.  Sgt. Rice also testified that he believed his decision was consistent with Pagedale policy.  Sgt. Rice offered several reasons for his decision to tow the car. The vehicle was a rental—it was not owned by Lewis;[5] Lewis was arrested and removed from the scene; and the vehicle was in the bank parking lot and Sgt. Rice did not want Lewis to return to

---

[3] Sergeant Rice testified that Lewis told one of the bank employees that he (Lewis) "had a thumper too," which was interpreted as indicating that Lewis was armed like the security guard. Sgt. Rice's testimony was not entirely clear as to whether he learned of that statement from the guard or from a teller.  (See Tr. at 81-82)

[4] Officer Cull testified that, at some point in the encounter, Sgt. Rice patted down Lewis and did not identify any weapons.

[5] The Toyota Corolla was a rental vehicle from EAN Holdings.  But at the time of the tow, the police did not yet know who the authorized renter/driver was.  As it turns out, Lewis was the renter.  [See Defendant's Exhibit A, Copy of Rental Car Agreement]

retrieve the vehicle if he was released from custody after booking.

Government's Exhibit 3 is a copy of the tow receipt completed by Sgt. Rice, and Exhibit 4 is a copy of the Pagedale Police Department Tow Policy. Prior to releasing the Toyota to the towing company, Sgt. Rice conducted an inventory search of the vehicle which he testified was consistent with the policy. During the inventory, he located a laptop case, an umbrella, and a firearm. Sgt. Rice could not recall if there was a laptop inside the case. At the time he decided to tow the vehicle, Sgt. Rice did not know that Lewis was a convicted felon, nor did he know that there was a gun in the vehicle.

After the inventory, Sgt. Rice contacted Officer Cull to determine how Lewis wanted the police to handle the laptop bag and umbrella. According to Sgt. Rice, Lewis instructed the police to release the computer bag and umbrella to Lewis's sister. Sgt. Rice seized the firearm. Sgt. Rice testified that he did not list the computer bag, umbrella, and firearm on the tow receipt because he seized those items from the vehicle and those items were documented elsewhere with an evidence receipt and the police report. (See Tr. at 59) It was his testimony that he documented the items consistent with the policy.

At no time did any officer provide Lewis with any Miranda warnings. At no time did any officer apply for a warrant to search the Toyota.

## II.   April 26, 2022 – University City Stop on Wanted

On April 26, 2022, Lewis was stopped, and ultimately arrested by, Officer Caleb Johnson of the University City Police Department. As explained below, Officer Johnson initiated the traffic stop based on a "wanted" issued by the Creve Coeur, MO, Police Department. To provide a proper context for the traffic stop, it is necessary to first understand the facts and circumstances that resulted in the wanted.

A.    **The Creve Coeur, MO, Incident**

Nicole Martin is a Sergeant with the Creve Coeur, MO, Police Department.  She has been an officer for approximately twenty-five years.   Among other duties, she serves as a patrol supervisor and domestic coordinator for her department.  Sgt. Martin was working the overnight shift on April 25-26, 2022.  Sgt. Martin testified that she received a dispatch call for a disturbance during the early morning hours of April 26, 2022.  The dispatcher reported a disturbance between the caller and her ex-boyfriend (later identified as Fabrice Lewis).  Sgt. Martin explained that, as she arrived, Lewis was attempting to leave the area in his vehicle.  Lewis was not arrested, but Sgt. Martin obtained his basic pedigree information and information concerning the vehicle—a Jeep Cherokee.  Lewis then left the area.

After Sgt. Martin spoke with Lewis's ex-girlfriend about the situation, she returned to her patrol car to start some paperwork.  Sgt. Martin testified that the ex-girlfriend came to Sgt. Martin's patrol car to report that Lewis was still calling her, and she played a voicemail of a call from Lewis after he left the area following his encounter with Sgt. Martin.  Sgt. Martin's body camera recorded most of the voicemail and that recording was offered into evidence as Government's Exhibit 12.  Sgt. Martin testified that the ex-girlfriend identified the voice on the recording as belonging to Lewis, and Sgt. Martin testified that she recognized the voice from her recent interaction with Lewis.   Based on the language used in the voicemail and the ex-girlfriend's reaction to the voicemail, Sgt. Martin concluded that she had probable cause to believe that Lewis had committed harassment in the 1st degree, which is a felony offense.

In April 2022, the Creve Coeur Police Department policy permitted supervisors to enter a "wanted" to arrest a person based on probable cause.  The policy was admitted as Defendant's Exhibit B.  The wanted, which was admitted as Government's Exhibit 5, indicated that Fabrice

Lewis (pedigree identified) was wanted for the charge of Harassment 1st Degree, on April 26, 2022, with complaint number 22-758. The wanted identified a vehicle as a 2016 Jeep Grand Cherokee SUV, as well as the VIN and license plate number of the Jeep. The wanted also listed an address for Lewis. The wanted form included two caution codes—one for "Armed & Dangerous" and one for "Known to Abuse Drugs." The second page of the wanted form had a "Remarks" section which stated, "Wanted for questioning by Sgt. Martin, 553." Additionally, there was a section under a heading entitled "PROBABLE CAUSE OR WARRANT NUMBER." The following was typed under that heading: "Lewis showed up at his ex-girlfriend's residence unannounced and created a disturbance. After leaving he called her several times and left her a threatening voicemail, which caused emotional distress to the victim." [Gov't Exh. 5 p. 2] Sgt. Martin testified that she listed Lewis as armed and dangerous and a potential drug abuser based on his arrest history, and that the information was consistent with the information she learned from Lewis's ex-girlfriend.

It is not disputed that wanteds are not equivalent to arrest warrants. And the Creve Coeur policy has changed since the incident in question. The current policy restricts the use of wanteds due to a decision from the Eighth Circuit that was reported after the events in question herein. See Furlow v. Belmar, 52 F.4th393 (8th Cir. 2022). The Furlow decision is addressed in the discussion of issues below.

Sergeant Martin testified that, as a supervisor, she had authority to enter the wanted into a regional law enforcement database known as REJIS, but the probable cause information is not uploaded into REJIS with a wanted. Based on the fax headers on Gov't Exh. 5, it appears that the wanted in this case was most likely uploaded between 2:30 a.m. and 3:05 a.m. on April 26, 2022. Sgt. Martin testified that her department lacked the manpower to immediately attempt to locate

and arrest Lewis that morning.

According to Sgt. Martin, if another police department encounters the person in the wanted, that agency is supposed to conduct a "ten-minute hit" inquiry to determine if the wanted is still active. (Tr. at 103) Upon receiving the "hit," the Creve Coeur Police will have an officer "pull the form, compare the information on the form to the information on the ten-minute hit, and then … confirm or deny that … the wanted is active." (Tr. at 104) Part of the Creve Coeur Police Department review includes confirming probable cause for the arrest. (Id.)

As discussed below, Lewis was arrested on the wanted the evening of April 26, 2022, by officers with the University City, MO, Police Department. Sgt. Martin testified that Officer Mooney confirmed that the wanted was active when Lewis was arrested. Ultimately, Lewis was not charged with harassment; Sgt. Martin testified that Lewis's ex-girlfriend was no longer interested in pursuing the charge.

After the evidentiary hearing, the parties submitted the Joint Stipulation of Facts, which addressed additional body camera video that the parties had shared shortly before the hearing, and which added some relevant, but not critical details to the Creve Coeur incident. [ECF No. 61][6] The Joint Stipulation of Facts reflects, among other things that: (1) an Officer named Mooney was present and spoke with Lewis; (2) Lewis was wearing an ankle monitor at the time; and (3) Lewis declined to discuss with Officer Mooney why he was wearing an ankle monitor.

**B.    The University City Traffic Stop, Arrest, and Vehicle Search**

Caleb Johnson is a patrol officer with the University City Police and has been an officer

---

[6] The Joint Stipulation of Facts includes a typographical error regarding the date of the interaction. The interaction occurred in 2022, not 2024. [See ECF No. 65, Lewis Post-Hearing Brief at n.1]

since 2017.  Michael Wamsganz is patrol officer and K9 handler with the University City Police. He has been a police officer since 2017, and a K9 officer since about October 2020.  Officer Wamsganz is the handler/officer for K9 Ryno.

The University City Police Department has access to a "FLOCK" system which, according to testimony, involves automated license plate readers.  Officers Johnson and Wamsganz were working the 7pm-7am shift beginning on April 26, 2022.  That evening, Officer Wamsganz received a FLOCK report that the license plate of a vehicle traveling west on Delmar Blvd., in University City, matched the license plate of the wanted entered by Sgt. Martin earlier that morning.  Officer Wamsganz notified Officer Johnson via cellphone of the FLOCK hit.[7]  Officer Johnson spotted the suspected Jeep traveling westbound on Delmar Blvd., and turning southbound on Big Bend Blvd.

Officer Johnson confirmed the license plate on the Jeep matched the information for the wanted and he initiated a suspicious vehicle stop by activating his lights and siren.  Officer Johnson testified that he observed the Jeep's driver leaning over and making obvious furtive movements toward the passenger side of the Jeep.  (See Tr. at 121)  Officer Johnson's dash camera recording corroborates his testimony.  On that recording, Officer Johnson can be heard saying, "Oh, he's hiding something."  (Gov't Exh. 6 at 19:17:35)

The Jeep pulled into a parking lot near Pershing Ave. and Big Bend Blvd. and parked. Officer Johnson testified that he treated the stop as a "felony stop … due to the nature of the wanted that had identified … the subject as armed and dangerous."  (Tr. at 121)  Officer Johnson directed the driver (who was later identified as Lewis) to show his hands and exit the Jeep.  Before Lewis

---

[7] Based on the testimony at the evidentiary hearing, Officer Johnson's did not have a functioning computer system in his patrol vehicle at the time and communicated via cell phone.

exited the Jeep, Officer Johnson can be heard saying, "Don't reach for anything Bro." (Gov't Exh. 6 at 19:18:35) Lewis exited the Jeep, and he appeared to have his keys and cell phone in his hands. Lewis was the only occupant of the Jeep, and he left the driver's door open. Officer Johnson also exited his patrol vehicle and, with his weapon drawn, approached Lewis. Lewis was compliant. Officer Johnson handcuffed Lewis and conducted a pat down search for weapons, found none, and retrieved Lewis's identification.

Officer Wamsganz arrived at the parking lot more or less contemporaneously with Officer Johnson. Officer Wamsganz can be seen in Officer Johnson's dash and body camera video recordings asking Lewis questions, apparently about the domestic incident in Creve Coeur earlier that morning. (Gov't Exh. 7 at 19:21:30) While Officer Wamsganz was speaking with Lewis, Officer Johnson called in Lewis's pedigree information and the audio recording indicates he was confirming that there was still an active wanted for Lewis and the Jeep.[8] (Gov't Exh. 7 at 19:21:50) Within a minute or so, Johnson formally arrested Lewis. (Gov't Exh. 7 at 19:22:46) Based on the time stamps on Officer Johnson's dash and body camera video recordings, about four minutes and thirty seconds elapsed from the time Lewis was stopped and directed to exit the Jeep, until Officer Johnson arrested him.

Officer Johnson and another officer who arrived at the scene separately moved Lewis to the other officer's vehicle. The other officer searched Lewis's person incident to arrest and recovered a small, knotted bag of what appeared to be a drug, from Lewis right pocket. (Gov't Exh. 7 at 19:23:11) Lewis was placed in the other officer's vehicle for transportation.

At about the same time that Officer Johnson arrested Lewis, Officer Wamsganz returned

---

[8] As noted above, Sgt. Martin testified that the process of confirming a wanted includes confirming probable cause, even though the statement of probable cause is not actually transmitted to the arresting agency. (See Tr. at 103-04)

10

this his vehicle for K9 Ryno.  Officer Wamsganz was not aware of the fact that a baggie of suspected narcotics was seized from Lewis's person incident to his arrest.  Officer Wamsganz then prepped K9 Ryno to conduct a sniff of the Jeep.[9]  Officer Wamsganz began the sniff at the front passenger side of the Jeep and then moved with K9 Ryno to the open driver's door.  Officer Wamsganz testified that K9 Ryno alerted to the odor/scent of narcotics by lying down next to the open door of the Jeep.  The video evidence shows K9 Ryno lying down next to the door and thereafter being rewarded with a toy.  (Gov't Exh. 7 at 19:24:10)  Based on the timestamps on the video evidence, the undersigned finds that K9 Ryno's alert occurred after the officers searched Lewis incident to arrest.

Officer Johnson testified that a Lieutenant named Davis made the decision to tow the Jeep.  According to testimony, it was common practice to conduct a K9 sniff of a vehicle after a person has been arrested and there has been a decision to tow.  (See Tr. at 144)

After the positive alert, Officer Johnson can be heard on the body camera recording saying that he saw Lewis hiding something when he initiated the traffic stop.  (Gov't Exh. 7 at 19:23:12)  The officers searched the Jeep.  Officer Wamsganz was on the passenger side while Officer Johnson was on the driver's side.  Officer Johnson told Officer Wamsganz to check the glovebox because he thought that was where he saw Lewis putting something.  (Gov't Exh. 8 at 19:28:11)  Upon learning that the glovebox was locked, Officer Johnson said he knew it would be locked because he saw Lewis reaching in that area.  (Exh. 8 at 19:28:24)  This statement was consistent with Officer Johnson's direction to Lewis not to "reach for anything bro" at the outset of their

---

[9] The body and dash camera video recordings show Officer Wamsganz don gloves, remove K9 Ryno from his patrol car, lead K9 Ryno to a sidewalk area away from the Jeep and other police officers, and then walk K9 Ryno to the Jeep for the dog sniff.  (See Gov't Exhs. 6 and 7 from approximately 19:23:35 to 19:24:10)

encounter, and with the fact that Lewis had his keys in his hands when he exited the Jeep.  (Exh. 6 at 18:18:35)

The officers used the key taken from Lewis to open the glovebox where they seized a loaded pistol with an extended magazine and several baggies of suspected narcotics.

At the evidentiary hearing, Officer Wamsganz testified about the training of K9 Ryno.  He was the second officer to work with Ryno and took on that responsibility in October or November of 2020.  After a period of bonding and obedience training, in January 2021, he and Ryno completed a six-week program at a K9 training academy operated by the American Mantrailing, Police and Work Dog Association ("AMPWDA").  Officer Wamsganz testified that about every two weeks, he and Ryno attend an eight-hour training program, and that Ryno is also re-certified annually.  Officer Wamsganz testified that Ryno was re-certified by AMPWDA on April 4, 2022, shortly before the incident with Lewis.

Officer Wamsganz testified that Ryno alerts to the presence of narcotic odors by laying down.  Officer Wamsganz explained that, after completing the initial certification in January 2021 and through the date of the evidentiary hearing, Ryno falsely alerted "[m]aybe three or four times" during training, but Ryno did not falsely alert during his re-certification in 2022.  (Tr. at 173)

Additional findings of fact are included in the discussion and analysis of the issues below.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

### I.    Pagedale Encounter – April 18, 2022

Lewis contends that his statement to the Pagedale police officers at the bank regarding an allegedly threatening statement must be suppressed because he was in custody at the time and he had not been provided Miranda warnings.  The government counters that Lewis was not in custody and, therefore, he was not entitled to Miranda protections.

Lewis also contends that the gun seized from the rental car he was driving on April 18, 2022, must be suppressed because the officers conducted an unconstitutional inventory search in that they did not follow department policy and the officers otherwise lacked probable cause to search the car. The government argues that the Pagedale police were authorized to tow Lewis's vehicle, and that the police inventoried the car in accordance with a reasonable interpretation of the department policy, and the police did not engage in a pretextual search for evidence or contraband.

### A.     Lewis's Statements to Police

The first issue our Court must resolve is whether Lewis was "in custody" when Sgt. Rice asked him if he made the threatening statement to the bank guard. The undersigned finds that Lewis's initial encounter with the police at the bank involved a lawful Terry stop, not an arrest.

Pursuant to Terry v. Ohio, 392 U.S. 1, 30 (1968), police officers may briefly detain a person based on reasonable suspicion "that criminal activity may be afoot." United States v. Davison, 808 F.3d 325, 329 (8th Cir. 2015) (citing Terry). "[A] Terry stop is justified only when the officer points to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Harvey, 1 F.4th 578, 581 (8th Cir. 2021) (citations and internal quotations omitted). "A reviewing court must look at the totality of the circumstances, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 581 (citations and internal quotations omitted). "The totality-of-the-circumstances test precludes [a] divide and conquer analysis. An officer may have reasonable suspicion to conduct a Terry stop based on a combination of factors even where no single factor, considered alone, would justify a stop." Id. at 582 (citation and internal quotations

omitted).  "As a standard for initiating an investigative stop, reasonable suspicion hovers well below preponderance of the evidence and need not rise to the level of probable cause."  McElree v. City of Cedar Rapids, et al., 983 F.3d 1009, 1015 (8th Cir. 2020) (citing United States v. Arvizu, 534 U.S. 266, 274 (2002)).  "Importantly, even if '[a]ll of [defendant's] conduct was by itself lawful,' reasonable suspicion may still exist—if conduct is 'ambiguous and susceptible of an innocent explanation' as well as a criminal one, 'officers [can] detain the individuals to resolve the ambiguity.'"  United States v. McMillion, 101 F.4th 573, 576-77 (8th Cir. 2024) (quoting Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).  Thus, while "an 'inchoate hunch' does not equate to reasonable suspicion, 'the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop.'"  United States v. Mosley, 878 F.3d 246, 251 (8th Cir. 2017) (quoting United States v. Tamayo-Baez, 820 F.3d 308, 312 (8th Cir. 2016)).

Even before Sgt. Rice and Officer Cull arrived at the bank, they were aware of a serious disturbance—someone at the bank activated the silent alarm.  Thus, there was a reasonable suspicion of some sort of criminal or dangerous activity afoot.  The officers also learned that Lewis had left the bank, but then returned.  When the officers arrived, they both noticed Lewis near a vehicle in the bank parking lot.  Officer Cull credibly testified that he observed Lewis, and it appeared as though Lewis was placing something in the vehicle.  At about this point in time, the officers asked Lewis generally about what was going on.  Also around this time, a bank guard came out and identified Lewis as the subject of the alarm.  On these facts, most notably that there was a silent alarm activation, that the subject of concern had left and then returned, and that a bank guard specifically identified Lewis as the subject of concern, the officers had a reasonable articulable suspicion of potential criminal activity, and they could lawfully, pursuant to Terry, detain Lewis while they attempted to figure out the status quo.

14

During this time, Lewis was not placed in handcuffs. Rather, he was told by the officers to stay away from the bank while they tried to sort out the situation. This was entirely reasonable given that there had been a disturbance. The record also demonstrates that the officers conducted a brief, yet reasonably thorough investigation of the circumstances. Both officers went into the bank at some point to get information from witnesses. During this process, the officers learned that Lewis was upset with an ATM transaction. They also learned that Lewis had made at least one threatening statement and suggested that he had a gun. Upon learning of the threatening statement, Sgt. Rice asked Lewis if he made the statement and Lewis stated that he had indeed made the statement. Sgt. Rice credibly testified that it was not until after Lewis admitted to making the threat, that he decided to arrest Lewis. Likewise, the officers did not physically restrain Lewis or put him into a police vehicle until after learning of and confirming he made the threat.

The parties agree that the officers never provided Miranda warnings to Lewis. But deciding that Lewis had not been formally arrested prior to his incriminating statement does not necessarily end the Court's inquiry. Whether a defendant is in custody for Miranda purposes is a separate question from whether the circumstances of a Terry stop constituted "an arrest for which probable cause was required." United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006). Thus, the Eighth Circuit has rejected a blanket rule that Miranda warnings are never required during a Terry stop. Id. at 909-10 (noting that most "Terry stops do not trigger the detainee's Miranda rights," and implying that some might trigger such rights) (quoting United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003)).

Because the principles of Miranda are well-known, only a brief review herein is needed. Statements made to law enforcement officers during custodial interrogation are normally subject to the protections and procedures identified in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966).

See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody …." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citation and quotation omitted). Miranda warnings are required when a suspect is both in custody and subjected to official questioning. See LeBrun, 363 F.3d at 720.

In determining whether a person is "in custody" for Miranda purposes where there has been no formal arrest, a reviewing court must consider "the totality of the circumstances," focusing on "the objective circumstances" and not the "subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 322-23 (1994). "Absent formal arrest, the police must give Miranda warnings when a suspect's freedom of movement is restricted to a degree akin to a formal arrest." United States v. Roberts, 975 F.3d 709, 716 (8th Cir. 2020) (citing California v. Beheler, 463 U.S. 121, 1125 (1983)). In this regard, the Eighth Circuit often relies on six so-called "Griffin" factors, to determine whether a person is in custody for Miranda purposes. The six Griffin factors are as follows:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of questioning.

United States v. Ferguson, 970 F.3d 895, 901 (8th Cir. 2020) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). "[T]he last three indicia are aggravating factors

which, if present, aggravate the existence of custody." Id. at 501. These are not the exclusive factors and "a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." Id.

The first factor weighs in favor of Lewis. Although the officers both testified that Lewis was free to leave, they did not inform him that he could leave or that he was not under arrest. The second factor weighs strongly in favor of the government. Lewis was not restrained prior to, or at the time, he made the alleged incriminating statement. While it is true that he was not allowed to go into or towards the bank, he otherwise retained all of his freedom of movement. Such a minor limitation in no way suggests that Lewis was in custody. The third factor favors the government slightly, if it favors either party. Although Lewis did not initiate contact with the police, the record reflects that his interactions were voluntary when the police spoke with him about the situation at the bank. The fourth factor weighs heavily in favor of the government. If anything, the police response was understated; they were responding to a silent alarm at a bank, and shortly after arriving a security guard confirmed that Lewis was the subject of concern. Yet the officers did not physically restrain Lewis or pat him down until after they had conducted a more detailed investigation of the situation, even though Lewis made some movements towards his waist or pants near the outset of the encounter. Furthermore, it is clear from the record that the officers did not use any deceptive or strong-arm tactics during their interactions with Lewis. The fifth factor is neutral and, perhaps, slightly favors the government. Although there were three officers present, the entire encounter occurred outdoors, in a public place, and Lewis was permitted to speak freely and provide his side of events. The sixth factor weighs in favor of Lewis. But the undersigned gives this last factor only slight weight.[10] At the time Lewis made the allegedly incriminating

---

[10] More recently, the Eighth Circuit has questioned whether an arrest is particularly relevant

statement, the officers were still gathering information.  It was not until after this statement that the police had probable cause for an arrest, and that was for a relatively minor assault; the police did not even know at this point that Lewis had a felony criminal record.

Applying the foregoing factors, the undersigned finds that a reasonable person in Lewis's position would not believe their freedom of movement was restrained to a degree akin to a formal arrest, see Roberts, 975 F.3d at 716, when Sgt. Rice asked Lewis if he made a threatening statement to the bank security guard.  Therefore, there was no Miranda violation, and the undersigned respectfully recommends that the Court deny Lewis's motion to suppress statements he made to Pagedale Police officers on April 18, 2022.

**B.    Evidence from Lewis's Rental Car**

 "The general rule is that a search [of private property] conducted without a warrant is unreasonable; however, inventory searches are one exception to that rule."  United States v. Nevatt, 960 F.3d 1015, 1020 (8th Cir. 2020) (citation omitted); see also United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008) ("Generally, a warrant is required to ensure a search's reasonableness.") (citation omitted).  "An inventory search must be reasonable under the totality of the circumstances; therefore, law enforcement may not use an inventory search as a ruse for general rummaging in order to discover incriminating evidence."  United States v. Williams, 39 F.4th 1034, 1043 (8th Cir. 2022) (citation and internal quotations omitted).  "The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime."  Id.

---

under an objective inquiry because the arrest occurs at the end.  See United States v. Treanton, 57 F.4th 638 (8th Cir. 2023).

The present record establishes that, after the police arrested Lewis, they conducted a warrantless inventory search of his rental car and then had it towed away.  As relevant herein, the police seized a firearm during the inventory search.  Lewis argues that the firearm must be suppressed because the inventory did not comply with policy.  There are two related issues that the Court should consider—the decision to tow and the execution of the inventory search.

Sergeant Rice testified that it was his decision to tow the rental car.  "The impounding of a vehicle passes constitutional muster so long as the decision to impound is guided by a standard policy—even a policy that provides officers with discretion as to the proper course of action to take—and the decision is made 'on the basis of something other than suspicion of evidence of criminal activity.'"  United States v. Perez, 29 F.4th 975, 984 (8th Cir. 2022) (quoting United States v. Lee, 474 F.3d 511, 514 (8th Cir. 2007)).

Government's Exhibit 4 is a copy of the Pagedale Police Department tow policy.  Paragraph 8A of the "GENERAL" provisions of the policy indicate that a vehicle may be towed "Incident to arrest."  A more detailed provision entitled "ARRESTED PERSON'S VEHICLE" states as follows:

> 1.     When a person who was operating a motor vehicle is arrested, the vehicle shall be towed.
>
> 2.     The officer shall notify the on-duty supervisor prior to towing vehicles whenever possible.
>
> 3.     The vehicle shall be inspected and inventoried prior to being removed by the towing company.  Only items of value need to be listed in the inventory.  This information shall be documented on the DOR 4569 Tow Form.  ***Valuable items or other items that may be susceptible to loss or theft shall be seized and tagged into evidence pending a claim.***  In cases wherein perishable items are located, a reasonable attempt should be made to forward those items to a location that will prohibit damage or loss.

(Gov't Exh. 4 at p.6; emphasis in original)

In this case, it is undisputed that Lewis was arrested and that he was the vehicle operator prior to his arrest.[11]  Sgt. Rice credibly testified that, as a supervisor, he had authority to tow the rental car.  And he explained that his decision to tow accounted for more than just the fact that Lewis had been arrested.  In addition to the fact of the arrest, Sgt. Rice considered that the car was a rental—it was not owned by Lewis and the officers did not have a copy of the rental agreement. Sgt. Lewis further explained that the car was in the bank parking lot, and he did not want Lewis to return to the bank, where there had just been an incident, to retrieve the vehicle after he was released from custody.  On these facts, the undersigned finds that the decision to tow the rental car complied with department policy.  Moreover, the decision was constitutionally reasonable given the circumstances—Sgt. Rice provided appropriate reasons to tow the rental car rather than leave it on the private parking lot or arrange for someone else to take it.[12]  These reasons support a

---

[11] Nobody suggests that Lewis lacks standing to challenge the inventory search of the rental car.  In this regard, the undersigned is mindful that "Fourth Amendment standing is 'useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search,' but it does not implicate Article III jurisdiction."  United States v. Bettis, 946 F.3d 1024, 1027 (8th Cir. 2020) (quoting Byrd v. United States, 138 S. Ct. 1518, 1530 (2018)).  See also United States v. Juneau, 73 F.4th 607, 613 (8th Cir. 2023).

[12] Lewis argues that the decision to tow was in violation of Missouri law, namely RSMo. § 304.155.1(5).  Section 304.155.1(5) relates to abandoned motor vehicles on public property, and it states, in relevant part:

> Any law enforcement officer within the officer's jurisdiction … may authorize a towing company to remove to a place of safety: …. (5) Any abandoned property for which the person operating such property is arrested for an alleged offense for which the officer takes the person into custody and where such person is unable to arrange for the property's timely removal.

The rental car in this case was on private property, not public property like a roadway.  Our Court's focus is on the Fourth Amendment, not Missouri law; the Eighth Circuit has explained that arresting officers are not required to seek arrangements other than towing.  See United States v. Morris, 915 F.3d 552, 556 (8th Cir. 2019) (explaining that "[n]othing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up

conclusion that Sgt. Rice's decision to tow the car was not a pretext to search for evidence.

Lewis contends that the gun must nonetheless be suppressed because Sgt. Rice's inventory procedures deviated from Pagedale's inventory policy. Lewis argues that the officers were acting on a hunch and the inventory search was a ruse for conducting a warrantless intrusion into the car.

Even assuming that the Pagedale police suspected Lewis of other criminal conduct, that does not invalidate the decision to tow and inventory the rental car. Police officers "are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity." Morris, 915 F.3d at 557 (citation and internal quotations omitted). "Rather, when police are conducting inventory searches according to such standardized policies, they may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." Id. (citations and internal quotations omitted). Thus, the search must be reasonable in view of the totality of the circumstances. See id. The general measuring stick for assessing the reasonableness of an inventory search is by reference to "standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." Id. (citation and internal quotations omitted).

Adherence to procedures, however, is not as rigid as Lewis's arguments might suggest. The Eighth Circuit "[has] recognized that inventory searches need not be conducted in a totally mechanical, all or nothing fashion." United States v. Nevatt, 960 F.3d 1015, 1020 (8th Cir. 2020) (citation and internal quotations omitted); see also United States v. Garreau, 658 F.3d 854, 857 (8th Cir. 2011). Thus, a deviation from a tow/inventory policy alone does not necessarily lead to

his car to avoid impoundment and inventory") (citation and internal quotations omitted).

a conclusion that the inventory search was a pretext and the suppression of evidence.  Rather, "[t]here must be something else; something to suggest the police raised the inventory search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." Nevatt, 960 F.3d at 1020 (citation and internal quotation omitted).  That "something else" is not present in this case.

It is not disputed that the laptop case, umbrella, and gun were not documented on the tow form, which was admitted as Government's Exhibit 3.  Sgt. Rice, however, credibly testified that he documented those items elsewhere, namely in an official report and evidence receipt.  He also explained he believed his inventory of the rental car complied with the Pagedale policy.  Sgt. Rice testified that it was his interpretation of the policy that items removed from the vehicle prior to towing could be documented in a report or logged as evidence.  That is not an unreasonable interpretation of the policy—the policy directs that some items should be seized and tagged into evidence.  Sgt. Rice seized three items—the laptop bag, umbrella, and gun.  He documented all three, just not on the tow form.  And he returned the laptop bag and umbrella to Lewis's sister at Lewis's request.

The decision to tow necessitated the need for an inventory search.  The decision to tow was reasonable and complied with department policy.  Furthermore, the testimony and circumstances established at the evidentiary hearing supports a finding that, at the time Sgt. Rice decided to tow the rental car, the officers did not even know that Lewis was a convicted felon.  In other words, there is no reason on these facts to assume, let alone conclude, that the police only towed the vehicle so that they could search it for contraband.

The Eighth Circuit has previously held that substantially similar circumstances did not give rise to suppression of a firearm seized during an inventory search.  In Garreau, a state trooper

seized a firearm during an inventory search, but the trooper failed to list the firearm on the inventory form, allegedly in contravention of policy.  See 658 F.3d at 857.  The Eighth Circuit found this to be a "minor deviation" from policy.  Id.  The Court explained that inventory searches serve to protect the property and to protect property owners and the police "from claims of lost, damaged, or stolen property.  [And] [n]either purpose seems to be furthered by listing contraband on an inventory log rather than an evidence log."  Id.

In this case, Sgt. Rice credibly testified that he interpreted the Pagedale policy as permitting him to list the items seized and removed from the rental car in a report or evidence log, rather than on the tow form.  That is not an entirely unreasonable interpretation of the policy, which was provided as Government's Exhibit 4.  And even if Sgt. Rice's interpretation is flawed, his deviation from the policy does not give rise to any reasonable inference that the inventory was conducted solely for criminal investigatory purposes.  It was, at worst, a minor deviation of the sort the Eighth Circuit has found excusable from a Fourth Amendment perspective.

In summary, the undersigned finds that the decision to tow the rental car complied with department policy and was reasonable in view of the totality of the circumstances.  The undersigned further finds that, even if the inventory log was not completed in strict accordance with department policy, any deviation was minor and would not give rise to an inference that the police were using the inventory as a ruse to conduct an unconstitutional search of the rental car.  Therefore, the undersigned respectfully recommends that the Court deny Lewis's motion to suppress the firearm seized from the rental car on April 18, 2022.

## II.    University City Encounter Car Stop on Creve Coeur Wanted – April 26, 2022

Lewis also asks the Court to suppress the evidence seized from his person and the Jeep he was driving on April 26, 2022.  Lewis contends that the car stop was unconstitutional and evolved

into an unlawful arrest which tainted the collection of evidence. Lewis also argues that the K9 alert of the Jeep was unreliable—it did not provide probable cause to search the Jeep and, therefore, did not purge the taint of the unconstitutional stop. Finally, Lewis argues that the government is not entitled to rely on the good faith exception to the exclusionary rule in this case.

The government offers a host of arguments in opposition. The government argues that the initial stop of Lewis and his Jeep was a constitutional <u>Terry</u> stop, and that during that stop the officers developed probable cause to search the Jeep due to a reliable K9 alert. Thus, the police could search the Jeep without a warrant pursuant to the automobile exception. The government also argues that the car stop complied with pre-<u>Furlow</u> precedent related to "wanteds." Therefore, the argument goes, the officers acted in good faith reliance on then-existing law. The government further argues that even if our Court applies <u>Furlow</u>, Lewis was properly arrested based on probable cause. Finally, the government argues that <u>Furlow</u> was wrongly decided and conflicts with prior Supreme Court precedent. The government acknowledges this last argument is being raised to preserve the issue for later consideration by the Eighth Circuit.

### A.    Car Stop by University City Police

The first issue to resolve is whether the car stop was constitutional. The basic facts are not in dispute. University City Police Officer Johnson initiated a traffic stop of Lewis's Jeep based on the Creve Coeur wanted. It is also not disputed that Lewis was arrested upon confirmation that the wanted remained active. The undersigned finds that the initial car stop was a constitutional <u>Terry</u> stop. The basic law concerning <u>Terry</u> stops / investigative detentions is outlined above. The Court must consider, however, whether the fact that the stop was initiated upon a wanted makes a difference.

The wanted system at issue herein, and as reflected in Sgt. Martin's testimony and the

24

exhibits, is the same in all relevant respects as the wanted system the Eighth Circuit addressed in Furlow v. Belmar, 52 F.4th 393 (8th Cir. 2022).  Although Furlow was decided after the incident herein occurred, it is pertinent to resolving the issues pending before our Court.

In Furlow, the Eighth Circuit considered a constitutional challenge of "wanteds" used to facilitate warrantless arrests and detentions.  The Court held that the wanted system, as then used in St. Louis County, MO, was not facially unconstitutional.  Id. at 400, 404.  That is to say, the use of wanteds did not per se violate the Fourth Amendment.  Recognizing that "[t]he ultimate touchstone of the Fourth Amendment is reasonableness," id. at 400-01 (quoting Lange v. California, 141 S. Ct. 2011, 2017 (2021)), the Court was careful to differentiate between arrests and custodial questioning, on one hand, and Terry stops, on the other hand.  For custodial and arrest situations, the Court explained that the use of a wanted to seize the person of someone requires probable cause or some narrow exception.  See id. at 401 (noting that "Wanteds must fall within an exception to the warrant requirement in order to survive scrutiny under the Constitution").  The Court recognized that a police officer could make a felony warrantless arrest based on probable cause if that officer had knowledge of the probable cause, either directly or under the collective knowledge doctrine.  See id. at 401-02.  "The collective knowledge doctrine imputes other officers' finding of probable cause to the arresting officers '[w]hen multiple officers are involved in an investigation' and 'as long as there is some degree of communication among the officers.'"  Id. at 402 (quoting United States v. Robinson, 664 F.3d 701-, 702 (8th Cir. 2011)).

In Furlow, it was not disputed that the arresting officers did not have any direct knowledge of any crime, but rather relied solely on the wanted.  On the facts before it in Furlow, the Court found that the collective knowledge doctrine did not apply because the arresting officers seized a person solely upon finding a wanted in a database, there was no showing of any joint investigation

with the necessary degree of communication applicable to the collective knowledge doctrine.[13]

One of the reasons the Eighth Circuit concluded that the St. Louis County wanted system was not facially unconstitutional was because, even though wanteds were problematic with respect to warrantless arrests, wanteds may not be unconstitutional when used to initiate an investigatory Terry stop.  The Court recognized that, while investigatory stops pursuant to Terry must be reasonable under the Constitution, unlike an arrest, they require neither a warrant nor probable cause.  See id. at 402-03.

In discussing wanteds and Terry stops, the Furlow panel considered the circumstances found constitutional in United States v. Hensley, 469 U.S. 221 (1985).  In Hensley, "a police department issued a 'wanted flyer' for an alleged armed robber … on the day it learned of his possible involvement in a felony aggravate robbery offense."  Furlow, 52 F.4th at 402-03 (discussing facts of Hensley).  The flyer was circulated and requested a stop for investigation only. The Supreme Court found the flyer supplied reasonable suspicion, and therefore a traffic stop of the suspect was constitutional because the officer conducting the stop could reasonably rely on the flyer.  The subsequent arrest of the suspect was premised on additional information discovered after the stop.  See id. at 403.  The Supreme Court also "suggested" that, an "arrest … based solely on the flyer … likely would have violated the Fourth Amendment," and if the suspect held been merely until the original jurisdiction came to question him, the detention may have "exceed[ed]

---

[13] Furlow involved a civil rights action, not a motion to suppress.  Although there was a clear panel majority ruling in Furlow, the case resulted in three separate opinions.  Judge Erickson authored the opinion for the Court.  Judge Shepherd concurred in part and dissented in part.  Judge Shepherd dissented from an aspect of the case (a "Monell" claim) which is not relevant to Lewis's case.  Judge Stras concurred in part and in the judgment.  Judge Stras would conclude that St. Louis County's use of wanteds did not violate the Fourth Amendment based on the "long common-law tradition of warrantless felony arrests supported by probable cause."  Furlow, 52 F.4th at 408-09 (Stras, J. concurring in part and concurring in the judgment).

the permissible limits of a Terry stop." Id. (quoting Hensley, 469 U.S. at 235).

To further understand the state of law in the Eighth Circuit concerning wanteds, it is also necessary to consider that the wanted at issue in this case was not just for Lewis, but also for his vehicle. And Furlow was not the first time the Eighth Circuit tussled with the St. Louis County wanted system. It previously considered the use of wanteds relative to vehicles associated with crimes. In United States v. Smith, 648 F.3d 654 (2011), a detective in St. Louis County, MO, issued a wanted for a white Cadillac in connection with a bank robbery. A few days later, an officer spotted the Cadillac and initiated a traffic stop in a parking lot. See id. at 656-57. The defendant challenged the constitutionality of the stop. The Eighth Circuit held, among other things, that "[p]olice officers may rely upon notice from another police department that a person or vehicle is wanted in connection with the investigation of a felony 'when making a Terry stop, even if the [notice] omits the specific articulable facts supporting reasonable suspicion.'" Id. at 659 (quoting United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004)). The Eighth Circuit further explained that, when "'a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.'" Id. (quoting Hensley, 469 U.S. at 232). And if the police "'are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety.'" Id. (quoting United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004)); see also Michigan v. Long, 463 U.S. 1032, 1047-48 (1983) (acknowledging the inherent danger to police officers during traffic stops).

Furlow left Smith undisturbed. Accordingly, whatever impact Furlow may have on the St.

Louis County, MO, "wanted" system for warrantless arrests, it did not alter the conclusion that a wanted notice, founded on at least reasonable articulable suspicion, may serve as a basis for conducting a constitutionally reasonable <u>Terry</u> stop.

The undersigned credits Sgt. Martin's testimony concerning the events leading up to her decision to issue the wanted. That wanted identified both Lewis and the Jeep. The undersigned finds, therefore, that Sgt. Martin issued the wanted for Lewis and his Jeep on at least a reasonable suspicion that Lewis had committed a felony offense. On that basis, University City Police Officers Johnson and Wamsganz could initiate a traffic stop of that Jeep the same day Sgt. Martin issued the wanted, consistent with both Supreme Court and Eighth Circuit precent, namely <u>Hensley</u>, <u>Furlow</u>, and <u>Smith</u>.

For the foregoing reasons, the undersigned respectfully recommends that the Court deny Lewis's motion to suppress evidence seized from the Jeep to the extent his motion to suppress challenges the constitutionality of the traffic stop.

### B.  <u>Search of Jeep Lewis's Jeep</u>

The next issue the Court must address is whether the University City Police search of the Jeep was constitutional. There are several perspectives from which a reviewing court might consider the search of Lewis's Jeep. But, having concluded that the car stop was constitutional, it is useful to consider first the timing of the K9 sniff and then the validity of the K9 detection. For the reasons stated below, the undersigned concludes that K9 Ryno's positive alert provided probable cause to search the Jeep under the automobile exception to the Fourth Amendment's warrant requirement.[14]

---

[14] "For an automobile or other vehicle, the general rule is that officers may conduct a search, without a warrant, if they have probable cause to believe that evidence of a crime or contraband will be found inside." <u>United States v. Crawford</u>, 93 F.4th 436, 440 (8th Cir. 2024)

As to the first issue, the government contends that the dog sniff in this case was conducted during a time permitted by Hensley. (See ECF No. 66-1 at 25) The undersigned agrees that the timing of the dog sniff was reasonable under the Fourth Amendment, at least on the specific facts of this case.

Although the wanted alone provided a lawful basis to initiate the traffic stop, Officer Johnson acquired additional suspicious facts that would warrant further investigation of the Jeep. At the very outset of the traffic stop, before Lewis pulled over, Officer Johnson noticed Lewis make a furtive movement as if he was hiding something. And as Officer Johnson was ordering Lewis to exit the Jeep, he again observed Lewis reaching. These two observations are reflected in Officer Lewis's dash camera recording. (See Gov't Exh. 6 at 19:17:35 and 19:18:35) Again, Officer Lewis's observations occurred after the police initiated the stop and must be considered as part of the totality of the circumstances. United States v. Redman, 39 F.4th 1030, 1033 (8th Cir. 2022) (explaining that the totality of the circumstances analysis considers, inter alia, "the parties' behavior when they become aware of the officer's presence") (citing United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005)); see also United States v. McMillion, 101 F.4th 573, 576 (8th Cir. 2024). Therefore, in addition to the reasonable suspicion provided by the Creve Coeur wanted— that Lewis was wanted for a felony offense, might be armed, and might abuse drugs—Officer Johnson developed further reasonable suspicion that Lewis was hiding something in the Jeep, and deploying a detection K9 to the Jeep was justified by facts apart from the wanted.[15]

---

(citation omitted).

[15] When an officer conducting a traffic stop "discovers information leading to reasonable suspicion of an unrelated crime, [the officer] may extend the stop and broaden the investigation." United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016) (citation omitted); see also United States v. Noriega, 35 F.4th 643, 650 (8th Cir. 2022). Although this was an investigatory stop, and not a stop for a traffic violation, the same logic applies.

The undersigned finds that the University City Police had a reasonable suspicion to conclude that Lewis might be engaged in additional criminal conduct at the time of the stop, apart from the information in the wanted. Therefore, even though Lewis was arrested a minute or two before the dog sniff was completed, the police had an independent basis to conduct that sniff, namely Lewis's suspicious movements after the police initiated the traffic stop. Stated differently, even if Lewis had not been arrested before the sniff, the police had developed additional reasonable articulable suspicion that would justify the limited intrusion of deploying a drug detection dog around the exterior of the Jeep. Therefore, the fact that the dog sniff occurred slightly after Lewis's arrest does not raise any constitutional concerns.[16]

The final issue regarding the Jeep search, therefore, is whether there was, in fact, probable cause to search the Jeep. It is not disputed that the University City Police searched the Jeep based on K9 Ryno's alert. "An alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." United States v. Rederick, 65 F.4th 961, 967 (2023) (cleaned up), cert. denied, 144 S. Ct. 241 (2023). And "[a] drug detection dog is considered reliable when it has been trained and certified to detect drugs." Id. "'If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to conflicting evidence offered) that the dog's alert provides

---

[16] With respect to the evidence seized from the Jeep, the fact that Lewis was arrested does not factor into the necessary analysis of whether the traffic stop and dog sniff were constitutional. Had the police not arrested Lewis, they could have searched the Jeep for dangerous weapons pursuant to Michigan v. Long, 463 U.S. 1032, 1049 (1983) and its progeny, which allows for a limited search of the passenger compartment of a car "if the police officer possesses a reasonable belief … that the suspect is dangerous and the suspect may gain immediate control of weapons." See also United States v. Williams, 39 F.4th 1034, 1043 (8th Cir. 2022); United States v. Goodwin-Bey, 584 F.3d 1117, 1120 (8th Cir. 2009). In other words, had Lewis not been arrested, the officers could have searched the passenger compartment of the Jeep pursuant to Michigan v. Long, without first deploying K9 Ryno and developing probable cause.

probable cause to search.'"  Id. (quoting Florida v. Harris, 568 U.S. 237, 246-47 (2013)).

Ultimately, a reviewing court must apply "the same 'flexible common-sense standard' as probable

cause," and consider the totality of the circumstances.  Id. at 968 (quoting Harris, 568 U.S. at 240).

The totality of the circumstances in this case support a finding that K9 Ryno's alert was

reliable and supplied probable cause to search the Jeep.  Lewis offers several facts for the Court to

consider in his effort to undermine K9 Ryno's reliability.  But those facts, when considered as part

of the totality of the circumstances, and upon a common-sense review of those circumstances, do

not undermine the reliability of the alert.

The evidence and testimony at the evidentiary hearing established the following facts and

circumstances relative to the sniff.  Ryno was certified, and later re-certified, by the American

Mantrailing, Police & Work Dog Association ("AMPWDA").  The undersigned finds AMPWDA

to be a bona fide organization based on the testimony and evidence provided at the hearing.  This

supplies validity of K9 Ryno's reliability.  See Harris, 568 U.S. at 246-47.  Although Lewis casts

stones at AMPWDA, he does not identify any meaningful deficiencies with the training and

certification process described by Officer Wamsganz, Ryno's handler.  For example, the fact that

the police paid AMWDA for the training and certification course, and that AMPWDA is a private

(i.e., a non-government entity) is largely if not entirely irrelevant.  There is no indication or

suggestion from the existing record that AMPWDA is a "paper mill" that certifies dogs without

any meaningful standards.[17]  To the contrary, Officer Wamsganz testified that Ryno completed a

---

[17] Lewis's notes that his counsel searched Westlaw for references to AMPWDA and found none.  The lack of reference in any legal decision does not detract from the evidence before the Court.  A lack of any reference could simply indicate that no party has ever raised any substantial issues concerning the certification processes employed by AMPWDA.  And had Lewis identified any substantial derogatory information concerning AMPWDA, that information could have been brought to the Court's attention.

six-week training course, participated in substantial bi-weekly training, and was re-certified on a yearly basis. Officer Wamsganz credibly testified that Ryno had only a few false alerts during training, and that he was careful not to reward Ryno for any false alerts. Significantly, Ryno had no false alerts in his re-certification, which was completed just two or three weeks prior the encounter with Lewis. Given the consistency and regularity of Ryno's training and testing, a few prior false alerts are not enough to conclude that Ryno's alert in this case was unreliable.

The undersigned finds that the government has demonstrated that K9 Ryno's alert in this case was, in fact, sufficiently reliable. And an "indication by a properly trained and reliable drug dog provides probable cause for … the search of a vehicle." United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010). Therefore, the police officers could constitutionally search Lewis's Jeep pursuant to the automobile exception to the Fourth Amendment's warrant requirement. As such, it is respectfully recommended that the Court deny Lewis's motion to suppress the evidence seized from his Jeep.

### C.    Summary – Evidence Seized from Jeep

The undersigned finds that Officer Johnson's traffic stop of Lewis's Jeep was an investigatory Terry stop, supported by reasonable, articulable suspicion. There is no basis to suppress evidence based on an unconstitutional traffic stop. The undersigned further finds that, in the process of conducting the investigatory traffic stop, Officer Johnson developed additional facts that provided a reasonable, articulable suspicion that Lewis had hidden contraband in the driver's compartment of his Jeep. Thus, the dog sniff of the Jeep did not violate Lewis's rights under the Fourth Amendment. Finally, the undersigned finds that K9 Ryno was a properly trained and reliable drug detection dog, and his alert provided probable cause to conduct a warrantless search of the Jeep under the automobile exception. Therefore, the undersigned respectfully recommends

that the Court deny Lewis's motion to suppress the evidence seized from the Jeep following the University City investigatory traffic stop that resulted in his arrest.

### D.    The Government's Additional Arguments

It is not necessary to address the government's alternative arguments to resolve the issues regarding the evidence seized from the Jeep.  But Lewis also asks the Court to suppress the evidence seized from his person incident to arrest.  There is no dispute that the police can search an arrestee incident to an arrest.  Rather, the issue requires the Court to decide if Lewis was lawfully arrested on the Creve Coeur wanted.  The government offers two reasons why the University City arrest of Lewis was constitutional, even though it stemmed solely from the wanted system that was deemed unconstitutional in Furlow.

### 1.    Was the Arrest Constitutional Even Under *Furlow*?

The government contends that there is an important distinction in the instant record that was not present in Furlow.  The government argues that there was, in fact, sufficient communication between Officer Johnson and the Creve Coeur Police following the car stop to invoke the benefits of the collective knowledge doctrine.  In other words, Officer Johnson did not simply arrest Lewis based on the wanted and the constitutional concerns at play in Furlow are remedied in this case.

In this case, Officer Johnson initiated a valid Terry stop (as discussed above), and then confirmed the validity of the wanted.  Sgt. Martin testified that Creve Coeur confirmed the wanted.  She also testified that part of the confirmation process involves confirming the existence of probable cause, but that the facts concerning probable cause are not transmitted.  Thus, per the government, there was sufficient communication and Sgt. Martin's knowledge of probable cause

may be imputed to Officer Johnson and the University City Police.[18]

The undersigned believes that, although perhaps a bit slim, the record supports the government's contention in this regard. If that is correct, then there is no reason to suppress the suspected drugs seized from Lewis's pocket incident to his arrest. Furthermore, the Court may consider the seizure of drugs from Lewis occurred before the police conducted the K9 sniff. On this interpretation of the facts, the police had probable cause to search the Jeep under the automobile exception, even before Ryno's positive alert. The alert simply added to the quantum of probable cause.

### 2.    Does the Good Faith Exception to the Exclusionary Rule Apply?

The government also asks the Court to find that Officer Johnson and the University City Police were acting in good faith when they arrested Lewis on the wanted. Per the government's position, even if the arrest was unconstitutional under the logic of Furlow, the Court should not suppress any evidence under the good faith exception to the exclusionary rule.

"[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" United States v. Davis, 564 U.S. 229, 238 (2011). The incident at issue herein occurred before the Eighth Circuit decided Furlow. The officers, therefore, did not have the benefit of the Court's decision. The government offers several arguments in favor of finding good faith. But the undersigned finds it sufficient to

---

[18] The government also notes that the Furlow panel concluded that the St. Louis County "Wanted System is broad enough to encompass situations that do not violate the Constitution, including those involving an arrest immediately after an officer has entered a wanted." Furlow, 52 F.4th at 404 (citing cases involving "exigent circumstances," "evanescent evidence" and "fleeing felons"). While the government is not suggesting that any of these circumstances exist, fears about a wanted languishing in the REJIS system are not present in this record because Lewis was arrested on the same day that Sgt. Martin entered the wanted.

turn to Judge Stras's concurring opinion in Furlow.  Judge Stras concluded that there was a long-standing history of making warrantless arrests based on flyers and bulletins which rested on probable cause.  His concurrence does not reflect the concern the majority had with the collective knowledge doctrine.  Furthermore, even the majority in Furlow concluded that the officers who made the unconstitutional arrest on a St. Louis County wanted were entitled to qualified immunity from civil rights liability.  While qualified immunity involves a different legal setting and standards, the same general logic informs the inquiry herein as to whether the law was clearly established relative to the use of wanteds, based on probable cause, to make felony arrests.

The undersigned finds that the purposes of the exclusionary rule would be poorly served in the circumstances of this case.  Therefore, if the Court finds it necessary to reach the question of good faith, the undersigned respectfully recommends that our Court hold that Officer Johnson was acting in good faith and that the evidence seized from both Lewis and the Jeep should not be suppressed.

### RECOMMENDATION

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Court DENY Lewis Motion to Suppress Statements and Physical Evidence [ECF No. 29].

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require review by a District Court Judge.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).  See also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

Pretrial proceedings in this matter have concluded with respect to Lewis.  This matter will be set for trial by FURTHER ORDER OF THE COURT before the Honorable Stephen R. Clark, Chief United States District Judge.

_____

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this __7th__ Day of _June_, 2024.