UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cr-00394-SRC |
| | ) | |
| FABRICE LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Memorandum and Order**

In April 2022, Fabrice Lewis encountered police officers on three occasions.  As a result of two of those encounters, the United States charged Lewis with several firearm and drug crimes based on evidence the police officers obtained by questioning and searching Lewis, and by searching two cars.  Lewis seeks to suppress that evidence, claiming that the police officers violated his Fourth Amendment rights.  United States Magistrate Judge John Bodenhausen issued a Report and Recommendation on Lewis's motion, to which Lewis now objects.  As explained below, the Court agrees with the R&R's conclusion that the Court need not suppress the evidence under the Fourth Amendment.

**I.     Background**

**A.     Factual background**

Lewis objects to the R&R on the grounds that it omitted significant factual details, but he does not challenge any of the R&R's factual findings.  *See* docs. 70, 73.  The Court nevertheless conducted a de novo review of the record and makes the following findings of fact for purposes of resolving Lewis's motion to suppress.  In doing so, the Court resolves Lewis's objections regarding allegedly omitted facts.

In April 2022, Lewis encountered police officers on three different occasions:  (1) in Pagedale, Missouri, after a bank employee activated a holdup alarm; (2) in Creve Coeur, Missouri, after his ex-girlfriend called the police reporting a disturbance; and (3) in University City, Missouri, after a University City police officer received an alert that a Jeep Grand Cherokee in his jurisdiction was wanted.  *E.g.*, doc. 62, Evid. Tr. at 13:17–14:2, 89:10–90:12, 119:4–22.  Lewis's motion to suppress relates to evidence that the police officers obtained during the Pagedale and University City incidents, two distinct events.  Doc. 29.  The Creve Coeur incident, however, precipitated the University City incident.  *See, e.g.*, doc. 62, Evid. Tr. at 125:25–127:7, 156:14–24. The Court therefore first considers the Pagedale incident and then considers together the University City and Creve Coeur incidents.

> **i.      The Pagedale incident**

On April 18, 2022, an employee at the Midwest BankCentre in Pagedale, Missouri, activated the holdup alarm, which is a silent button that a teller pushes when in distress.  *Id.* at 13:12–14:2.  Three Pagedale police officers responded to the call:  Officer Justin Cull, Sergeant Dewey Rice, and Lieutenant Anthony Huckleberry.  *Id.* at 13:17–24, 47:22–48:1, 66:16–22. Officer Cull graduated from law-enforcement academy in 2013 and has served in the Pagedale Police Department for about seven years.  *Id.* at 12:13–19.  Sergeant Rice has been in law enforcement for approximately thirty years.  *See id.* at 47:10–18.  He served in Pagedale from about 2019 to 2023.  *Id.* at 47:13–15.  Officer Cull and Sergeant Rice testified at the evidentiary hearing about the Pagedale incident.  They explained that they did not obtain a recording of the Pagedale incident because the Midwest BankCentre's video security system did not work at the time.  *Id.* at 41:5–24, 76:19–77:2.

Lewis asserts that the R&R omitted the fact that "[t]hree officers were present during the initial interaction with Mr. Lewis." Doc. 70 at 3 (citation omitted).[1] The R&R belies Lewis's assertion: the R&R found and considered the fact that "there were three officers present." Doc. 69 at 17. Although the R&R did not include this factual finding in the findings-of-fact section (rather, it included it in the conclusions-of-law section), the R&R explicitly noted that it included "[a]dditional findings of fact . . . in the discussion and analysis of the issues." *Id.* at 12, 17. Moreover, the R&R's omission of this fact in the findings-of-fact section was immaterial to and did not affect Lewis's substantial rights and therefore must be disregarded. Fed. R. Crim P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Thus, the Court overrules Lewis's objection.

While en route, Officer Cull and Sergeant Rice received dispatch information regarding the holdup alarm, including that a male suspect possibly had a firearm and that he had threatened a security guard. Doc. 62, Evid. Tr. at 20:3–6. Further, the officers learned that the suspect had left the bank and then returned and that the incident may not have been a holdup. *Id.* at 20:3–6, 32:13–18, 43:18–22. Officer Cull did not include information in his report about the suspect leaving and returning. *Id.* at 32:13–20.

Officer Cull and Sergeant Rice arrived at the bank at approximately the same time. *See id.* at 14:10, 63:17–19. Although driving separate cars, they both entered the parking lot, which several businesses share, on Page Avenue. *See id.* at 14:6–9, 14:20–15:13, 64:21–25. Exhibits 1

---

[1] The Court cites to pages as assigned by CM/ECF.

and 2, included below, generally depict the parking lot, but they are not pictures of the parking lot on the day in question:









Exs. 1–2; doc. 62, Evid. Tr. at 15:14–18, 16:3–7.

As Sergeant Rice arrived, he saw Lewis walking from the bank to a car parked in the parking lot. Doc. 62, Evid. Tr. at 65:5–8. In relation to Exhibit 2, the car Lewis walked towards— a Toyota Corolla he rented—was parked on the left-hand side, approximately at the location of the white car with a black roof. *See id.* at 18:10–22, 53:6–14; Exs. 2–3. Officer Cull saw Lewis getting into the Toyota when he first arrived at the scene. Doc. 62, Evid. Tr. at 14:6–9. From Officer Cull's perspective, Lewis appeared to place something into the Toyota, *id.*, but Officer Cull did not document that observation in his report, *id.* at 27:22–28:5. Sergeant Rice also saw Lewis by the Toyota and "assumed that [Lewis] had placed something inside" of it because, from Sergeant Rice's perspective, Lewis "appeared to be closing the door." *Id.* at 65:10–13. But Sergeant Rice did not see Lewis place something in the Toyota. *Id.* at 65:18.

Sergeant Rice and Officer Cull both parked their cars and exited them to determine what caused a bank employee to activate the holdup alarm. *See id.* at 16:12–17:9, 29:19–24. Lewis argues that the R&R omitted the fact that "[w]hen officers first arrived at the bank, they parked on either side of the nearest exit so that Mr. Lewis was sandwiched between them." Doc. 70 at 3 (citations omitted). The United States disagrees, arguing that record does not support that the officers "sandwiched" Lewis and that this fact is irrelevant. Doc. 72 at 4. The Court construes this objection as asking the Court to make and consider factual findings regarding (1) where the officers parked when they arrived at the bank; (2) where the Toyota was parked in relation to the police cars; and (3) where Lewis and the officers were when the officers arrived. The Court considers each below.

First, the Court agrees with Lewis that the R&R did not address where the officers parked when they arrived at the bank. *See* doc. 69. The Court therefore sustains the objection on this

ground and finds that, in relation to Exhibit 2, Sergeant Rice parked his car next to the two white pillars in the bottom right corner, doc. 62, Evid. Tr. at 29:19–24, and Officer Cull parked his car parallel to Page Avenue and next to the white-and-blue sign that is located to the left of the Midwest BankCentre sign, *id.* at 16:12–17:9.

Second, the Court agrees with Lewis that the R&R did not address where the Toyota was parked in relation to the police cars. *See* doc. 69. The Court therefore sustains the objection on this ground and finds that the record supports that the Toyota was between Officer Cull's and Sergeant Rice's police cars. Doc. 62, Evid. Tr. at 65:2–4. The Court, however, overrules the objection to the extent that it characterizes the Toyota as "sandwiched" between the police cars. "Sandwiched" is "chiefly" used in a figurative sense to mean "[t]o insert (something) between two other things of a widely different character." *Sandwich*, Oxford English Dictionary, https://www.oed.com/dictionary/sandwich_v?tab=meaning_and_use#24496236; *see also Sandwich*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sandwiched (defining "sandwich," when used as a verb, as "to make into or as if into a sandwich" and "*especially* . . . to insert or enclose between usually two things of another quality or character"). For example, when used in the sports context, to "sandwich" means "[t]o block the movement of (an opposing player) by trapping or crushing him or her between oneself and a team-mate." *Sandwich*, Oxford English Dictionary, https://www.oed.com/dictionary/sandwich_v?tab=meaning_and_use#24496236. Here, the record lacks evidence that supports characterizing the location of Lewis or the Toyota as "sandwiched" between the officers or their police cars. *See, e.g.*, Ex. 2; doc. 62, Evid. Tr. at 16:18–21, 18:2–22, 29:19–24. No evidence shows that the police officers blocked Lewis or the Toyota from moving or leaving. For example, the record lacks evidence that Officer Cull or Sergeant Rice blocked the exits of the parking lot or that cars were parked around the Toyota,

thereby prohibiting Lewis from exiting the parking lot in the Toyota. Thus, the Court overrules Lewis's objection to the extent that it characterizes the location of Lewis as "sandwiched" between the officers or their police cars.

Finally, the Court overrules Lewis's objection to the extent that it claims the R&R omitted facts about where Lewis and the officers were when the officers first arrived because the R&R considered those matters on several occasions. *See, e.g.*, doc. 69 at 3 ("[W]hen the officers first arrived, Lewis was near a vehicle."). Further, the Court makes findings regarding the locations of Lewis and the officers throughout this section as they become relevant to the events the Court discusses.

After the officers exited their cars, Officer Cull and Sergeant Rice spoke with Lewis to determine what had happened. Doc. 62, Evid. Tr. at 14:6–12, 19:21–25. The officers did not detain Lewis or restrain him in any way during that conversation. *Id.* at 22:3–10, 23:13–21, 24:4–7. At some point, Lewis told the officers that he had a dispute with the bank concerning an ATM deposit. *Id.* at 36:5–16, 68:12–16. Lewis was upset because he believed that the bank had not properly credited him for the cash he deposited. *Id.* Both Officer Cull and Sergeant Rice testified that Lewis was free to leave during their initial investigation and that they may have pursued and arrested Lewis once they believed they had enough information for an arrest. *Id.* at 30:13–31:3, 67:17–68:2, 79:24–80:8.

Lewis objects to the R&R on the ground that the R&R failed to consider that "[a]ll three officers on the scene told Lewis "to remain near his Toyota" during their initial interaction. Doc. 70 at 3 (citing doc. 62, Evid. Tr. at 66:24–67:4). Upon review of the R&R, the Court finds that it did discuss that "the officers kept Lewis closer to his vehicle," doc. 69 at 3, and they did not allow Lewis "to go into or towards the bank," *id.* at 17. But the R&R did not address whether all three

officers told Lewis to remain near the Toyota during the initial interaction. *See* doc. 69. The Court finds that the record supports Lewis's position and therefore sustains his objection regarding this fact. Accordingly, the Court finds that during their initial interaction, all three officers on the scene told Lewis to remain near the Toyota. Doc. 62, Evid. Tr. at 66:24–67:4.

Shortly after the officers began talking to Lewis, a bank security guard exited the bank and said, "That's him right there," and identified Lewis as the person who caused the issue leading to the activation of the holdup alarm. *Id.* at 19:3–6, 19:24–20:2, 44:1–6. Officer Cull testified that Lewis called the guard pejorative names. *Id.* at 21:13–14. Both officers testified that they took actions to de-escalate the situation. *See, e.g.*, *id.* at 22:3–13, 49:23–24, 50:10–18. For example, Sergeant Rice testified that the security guard stood closer to the bank, and the officers kept Lewis from reentering the bank and kept him closer to the Toyota. *Id.* at 50:12–18.

Sergeant Rice then went into the bank. *Id.* at 19:5–8, 20:7–12. Officer Cull stayed outside with Lewis until Sergeant Rice came back outside. *Id.* at 20:9. Lewis claims that the R&R failed to consider that "while Sergeant Rice spoke with the bank's security guard, Officer Cull repeatedly instructed" him "to keep his hands out of his pockets and stay near the" Toyota. Doc. 70 at 3 (citations omitted). Upon review of the R&R, the Court finds that the R&R did find as a fact that Officer Cull "told Lewis to keep his hands out of his pockets," doc. 69 at 3, but it did not find specifically that Officer Cull did so while Sergeant Rice was inside, *see* doc. 69. Therefore, because the record supports Lewis's position, the Court sustains Lewis's objection and finds that while Sergeant Rice was inside the bank, Officer Cull continuously told Lewis to keep his hands out of his pockets. Doc. 62, Evid. Tr. at 20:13–17, 21:15–18. Further, the Court finds that Officer Cull instructed Lewis about his hands because Lewis continuously placed his hands into his pocket and was possibly armed. *Id.* at 20:13–21:5.

8

The Court, however, overrules the objection as it relates to Officer Cull's allegedly repeated instructions about Lewis's staying near the vehicle.  Officer Cull did instruct Lewis to stay near the Toyota, but Lewis has not identified evidence supporting that Officer Cull "repeatedly" instructed him to do so.  *Id.* at 20:16–21:18; doc. 70 at 3 (citing doc. 62, Evid. Tr. at 20:16–21:18).

While Sergeant Rice was inside of the bank, the bank security guard told Sergeant Rice that Lewis had threatened the guard, including by telling the guard that he (Lewis) was going to shoot the guard.  Doc. 62, Evid. Tr. at 49:6–13, 68:8–20, 70:17–21.  In addition, a bank teller told Sergeant Rice that Lewis had told one of the bank employees, "I have a thumper too."  *Id.* at 81:18–82:5.  Sergeant Rice interpreted the thumper statement as indicating that Lewis was armed like the security guard.  *Id.* at 81:18–23.

Sergeant Rice then went outside, and Officer Cull went into the bank to talk to the bank security guard and the teller who had pressed the holdup alarm.  *Id.* at 20:9–12.  While outside, Sergeant Rice asked Lewis if he had made the thumper statement, and Lewis admitted that he had. *Id.* at 22:18–23:5, 51:25–52:6, 68:25–69:11.  While Sergeant Rice questioned Lewis, the officers never placed Lewis in handcuffs nor physically restrained him, but they did not permit him to approach or reenter the bank.  *See id.* at 23:1–24:7.  Lewis claims that the R&R omitted that "[w]hen Sergeant Rice interrogated Mr. Lewis, he stood close enough to touch Mr. Lewis and may have had a hand on Mr. Lewis'[s] back."  Doc. 70 at 4 (citations omitted).  The United States does not dispute that the R&R did not address this fact, but rather argues that the fact is irrelevant.  *See* doc. 72 at 5.  Having considered the record de novo, the Court sustains Lewis's objection and finds as a fact that Sergeant Rice stood next to Lewis when asking him about his interaction with the bank security guard and that Sergeant Rice may have had his hand on Lewis's back.  Doc. 62,

Evid. Tr. at 42:14–21.  During the questioning, Lewis appeared to Sergeant Rice as "a little bit upset[] . . . because of the ongoing verbal conflict that was taking place" between Lewis and the bank security guard.  *Id.* at 49:24–50:8.

After Lewis admitted that he made a threatening statement to the bank security guard, Sergeant Rice directed Officer Cull to arrest Lewis for Assault in the Fourth Degree.  *Id.* at 24:8–12, 52:7–13, 52:20–53:1.  Officer Cull handcuffed Lewis and placed Lewis in a police car.  *Id.* at 24:8–16.  At some point in the encounter, Sergeant Rice patted down Lewis, but he did not identify any weapons.  *Id.* at 35:9–10, 35:19–20.  The officers also spoke to some other bank employees who gave statements that were consistent with the bank security guard's statements. *Id.* at 52:14–19.

Following Lewis's arrest, Sergeant Rice decided to tow the Toyota.  *Id.* at 54:17–19. While making that decision, Sergeant Rice did not know that Lewis was a convicted felon or that there was a firearm in the Toyota.  *See id.* at 55:18–21.  Sergeant Rice had several reasons for his decision to tow the car, including that the vehicle was a rental; Lewis was arrested and removed from the scene; and Sergeant Rice did not want Lewis to return to retrieve the vehicle from the bank parking lot if he was released from custody after booking.  *Id.* at 74:13–21.  At the time of the tow, the officers knew that the Toyota was a rental vehicle registered to EAN Holdings, but they did not know who the authorized renter or driver was.  *Id.* at 40:17–41:1, 58:6–17.

Sergeant Rice, as the on-duty supervisor, had the authority to make towing decisions and believed that towing the Toyota was consistent with the Pagedale Police Department's towing policy.  *Id.* at 54:17–21, 75:21–76:2.  The Pagedale towing policy, in part, provides:

**POLICY:**

All Pagedale Police Department personnel shall follow the guidelines set forth in this General Order when towing and reporting on towed vehicles.

10

**GENERAL:**

1. A Missouri Department of Revenue "Crime Inquiry and Inspection Report/Authorization to Tow Form" aka "Tow Form" (DOR form 4569) shall be completed whenever a vehicle is towed by a member of this department.

2. Any vehicle requiring to be towed within the City of Pagedale by a police officer shall make sure the on-duty supervisor has knowledge of same prior to the vehicle being towed.

3. All towed vehicles shall be inspected for damage and all contents inventoried and noted on the tow form.

4. If the vehicle owner is not present when the vehicle is towed, the officer shall make a reasonable effort to notify the vehicle owner of the tow and the location to where it was towed when possible.  Such notifications or attempts to notify shall be documented on the bottom portion of the tow form and included in the officer's report.

     . . .

8. A vehicle may be towed for any of the following purposes:

     A. Incident to arrest;

. . . .

**VEHICLE RELEASE:**

1. Generally, a vehicle may only be released to the registered owner.  . . .

. . . .

**ARRESTED PERSON'S VEHICLES:**

1. When a person who was operating a motor vehicle is arrested, the vehicle shall be towed.

2. The officer shall notify the on-duty supervisor prior to towing vehicles whenever possible.

3. The vehicle shall be inspected and inventoried prior to being removed by the towing company.  Only items of value need be listed in the inventory.  This information shall be documented on the DOR 4569 Tow Form.  ***Valuable items or other items that may be susceptible to loss or theft shall be seized***

11

> ***and tagged into evidence pending claim.*** In cases wherein perishable items are located, a reasonable attempt should be made to forward those items to a location that will prohibit damage or loss.

Ex. 4 at 1–3, 6.

Upon Sergeant Rice's decision to tow the Toyota, the officers did not take any steps to determine if someone else could pick up the car for Lewis. Doc. 62, Evid. Tr. at 74:13–75:20. But Sergeant Rice did conduct an inventory search of the car before the towing company arrived. *Id.* at 54:22–55:6. He found a laptop case, an umbrella, and a firearm. *Id.* at 55:7–11. While testifying, Sergeant Rice could not recall if there was a laptop inside the case. *Id.* at 55:8–9.

Sergeant Rice filled out a tow report. Ex. 3. The tow report has spots to include information about the vehicle being towed, the driver's name, the registered owner, and the reason for removal. *Id.* Sergeant Rice filled out that information. *Id.* In addition, under the "COMMENTS/INVENTORY" spot, he wrote "N/A" for "COMMENTS REGARDING DAMAGE," but left "DESCRIPTION OF ITEMS IN VEHICLE" blank. *Id.* Sergeant Rice did not list or comment about the laptop case, umbrella, or firearm on the tow report. *Id.* Instead, he seized those items from the Toyota, and they were documented on an evidence receipt and police report. *See* doc. 62, Evid. Tr. at 55:12–17, 59:1–9. Sergeant Rice testified that he believed that he had documented the items in a manner consistent with the tow policy. *Id.* at 63:3–7.

After the inventory search, Sergeant Rice contacted Officer Cull to tell him about finding the laptop bag and umbrella. *See id.* at 56:2–6. Officer Cull communicated this information to Lewis who then instructed the police to release the computer bag and umbrella to Lewis's sister. *Id.* at 56:2–12. While talking to Officer Cull, Sergeant Rice learned that Lewis is a convicted felon. *Id.* at 55:18–56:1.

At no point during the Pagedale incident did any officer provide Lewis with any *Miranda* warnings or apply for a warrant to search the Toyota. *Id.* at 35:25–36:4, 69:6–8.

### ii.    The University City and Creve Coeur incidents

On April 26, 2022, Officer Caleb Johnson of the University City Police Department initiated a traffic stop of a Jeep Grand Cherokee, which Lewis was driving, based on a "wanted" issued by the Creve Coeur Police Department. *See, e.g.*, *id.* at 119:4–23, 121:12–14, 126:1–12, 136:16–17. Officer Johnson ultimately arrested and searched Lewis, and Officer Johnson and other officers searched the Jeep. *Id.* at 126:12–18; Ex. 8. Below, the Court first finds facts regarding the events that led to the Creve Coeur Police Department's issuance of the wanted and then finds facts regarding the events that took place after the Creve Coeur Police Department issued the wanted, including the traffic stop, arrest, and searches.

### 1.    Events in Creve Coeur

On April 25, 2022, Sergeant Nicole Martin of the Creve Coeur Police Department began her overnight shift at 6:00 p.m. Doc. 62, Evid. Tr. at 89:10–14, 107:12–13. Sergeant Martin has been an officer for 25 years. *Id.* at 88:9–11. Some of her duties include serving as the senior patrol supervisor and the domestic coordinator for her department. *Id.* at 88:18–89:9. As the senior patrol officer, Sergeant Martin responds on calls with officers, reviews reports and paperwork, and handles any incidents assigned to her role. *Id.* at 88:20–24. Similarly, as the domestic coordinator, she compiles reports, sends alerts to other agencies, such as the Adult Abuse Office, and completes emergency ex parte paperwork. *Id.* at 88:25–89: 9.

During the early morning hours of her shift, Sergeant Martin received a dispatch about a disturbance between a caller and her ex-boyfriend. *Id.* at 89:15–90:4. Sergeant Martin and Officer Mooney responded to the call. *Id.* at 105:9–12. As Sergeant Martin arrived at the caller's

house, Lewis was attempting to leave the scene in a Jeep Grand Cherokee. *Id.* at 90:5–12, 100:19–21. Sergeant Martin and Officer Mooney investigated the disturbance before Lewis could leave. *Id.* at 91:1–3. The record does not have evidence establishing whether the officers prevented Lewis from leaving the scene or whether Lewis chose to stay.

The officers spoke with Lewis and his ex-girlfriend separately. Doc. 61 at ¶ 1. The ex-girlfriend told Sergeant Martin that "Lewis had an ankle bracelet that 'logs where he goes,'" and inquired about whether Sergeant Martin could "put out an alert for officers to be notified if Lewis's vehicle came to the premises of her condo complex." *Id.* at ¶¶ 2–3. Lewis told Officer Mooney that he did not want to talk to Officer Mooney about why he had the ankle monitor, but he did tell Officer Mooney that he did not have his ankle monitor for either parole or probation. *See id.* at ¶ 4. Sergeant Martin also obtained Lewis's pedigree information and logged the Jeep's license-plate number. Doc. 62, Evid. Tr. at 95:12–21. Sergeant Martin then told Lewis to leave, which he did. *Id.* at 108:9–12.

After investigating the disturbance, Sergeant Martin returned to her police car to complete some paperwork. *Id.* at 91:14–16. The ex-girlfriend approached Sergeant Martin while she completed the paperwork to report that Lewis was still calling the ex-girlfriend. *Id.* at 91:14–18. Sergeant Martin saw on the ex-girlfriend's phone that the phone had an incoming call from an "unknown caller" or "no caller ID" was calling. *Id.* at 91:20–22. The ex-girlfriend then played a voicemail that Lewis left on her phone at 1:29 a.m. that morning, i.e., after he had left the scene. *Id.* at 92:2–8. Sergeant Martin listened to the voicemail, and her body camera recorded most of it. *Id.* at 92:9–10, 93:1–12; Ex. 12. Both the ex-girlfriend and Sergeant Rice recognized the voice in the voicemail as Lewis's voice. Doc. 62, Evid. Tr. at 92:15–22. The United States offered the body-camera recording into evidence during the evidentiary hearing, and the magistrate judge

14

admitted it.  *Id.* at 93:1–19.  The Court has reviewed the body-camera recording, thereby listening to the voicemail Lewis left for his ex-girlfriend.

In the voicemail, Lewis called the ex-girlfriend a "b*tch" several times, told her to be "on guard," referred to the fact that the ex-girlfriend "kept on calling the police," and commented about the ex-girlfriend's ability to have children.  Doc. 62, Evid. Tr. at 94:6–17; Ex. 12.  Sergeant Martin thought Lewis had a hostile tone of voice in the voicemail and characterized the voicemail as threatening, doc. 62, Evid. Tr. at 92:23–25, 94:12–14, and the Court agrees.  Sergeant Martin observed the ex-girlfriend react to the voicemail:  the ex-girlfriend "seemed very upset and nervous and scared."  *Id.* at 94:18–20, 112:17–19.  Based on the voicemail, the ex-girlfriend's reaction, and what she knew about Lewis's relationship with the ex-girlfriend, Sergeant Martin concluded that she had probable cause to believe that Lewis had committed harassment in the first degree, a felony offense.  *Id.* at 95:3–11, 96:4–6.

When this incident occurred, the Creve Coeur Police Department had a policy that permitted supervisors to enter a wanted to arrest a person based on probable cause.  *Id.* at 95:22–96:6; Ex. B.  The Creve Coeur policy has changed since the incident in question.  Doc. 62, Evid. Tr. at 110:21–23.  The current policy restricts the use of wanteds in the light of *Furlow v. Belmar*, 52 F.4th 393 (8th Cir. 2022), decided after the events at issue in this case happened.  *See* doc. 62, Evid. Tr. at 110:21–111:7.

Under the policy applicable at the time of the incident, Sergeant Martin filled out a request for a computer entry for a wanted person, signed the request, and then had the dispatch center enter it into the Regional Justice Information System.  *Id.* at 95:22–97:11; Ex. 5.  REJIS is an electronic database of information, including license-plate numbers, wanted people, guns, and stolen articles.  Doc. 62, Evid. Tr. at 95:22–97:11; Ex. 5.  The request form includes spots to add

15

information regarding the type of entry (in this case a wanted), the person who is wanted, the

charges, a vehicle, the person's address, remarks, and probable cause.  Ex. 5.  Sergeant Martin

filled out this form with information about Lewis, such as his name, physical descriptors, license

number, and address.  *Id.*  She also included two "caution codes" about Lewis:  "Armed &

Dangerous" and "Known to Abuse Drugs."  *Id.*  Sergeant Martin testified that she listed Lewis as

armed and dangerous and a potential drug abuser based on his arrest history, and that the

information was consistent with the information she learned from Lewis's ex-girlfriend.  Doc. 62,

Evid. Tr. at 99:13–100:3.

On the request form, Sergeant Martin also included information about the Jeep, including

its license-plate number and vehicle identification number, and a probable-cause statement.  Ex. 5.

The probable-cause statement reads:  "Lewis showed up at his ex-girlfriend's residence

unannounced and created a disturbance.  After leaving[,] he called her several times and left her a

threatening voicemail, which caused emotional distress to the victim."  *Id.*  Sergeant Martin also

wrote that she wanted Lewis for questioning and that the charge was "Harassment 1st Degree."

*Id.*

As a supervisor, Sergeant Martin had the authority to sign off on the wanted request

without approval by another officer.  Doc. 62, Evid. Tr. at 111:17–22.  Thus, Sergeant Martin

signed the request after completing it and then faxed it to the dispatch center for entry into REJIS.

*Id.* at 96:21–97:11.  The dispatch center entered the wanted into REJIS somewhere between 2:38

a.m. and 3:05 a.m. on April 26, 2022.  *Id.* at 103:6–14; Ex. 5.  When entering the wanted into

REJIS, the dispatch center included information about Lewis, including the caution codes; the

charge; the vehicle information; and Sergeant Martin's remark that she wanted Lewis for

questioning.  *See* doc. 62, Evid. Tr. at 101:14–20.  The dispatch center did not enter the probable-

cause statement into REJIS.  *Id.* at 101:21–24.  Sergeant Martin testified that her department

lacked the manpower to immediately attempt to locate and arrest Lewis that morning.  *Id.* at

116:15–20.

### 2.    Events in University City

#### a.    Traffic stop of the Jeep

In the evening of April 26, 2022, Officer Johnson, a University City Police Department

officer, started his overnight shift at 7:00 p.m.  *See id.* at 118:19–119:3.  During that shift, another

officer, Officer Wamsganz, received an alert from the Flock Safety System.  *Id.* at 150:19–20,

156:12–14.  The Flock Safety System is an automated license-plate reading system that includes a

series of cameras that read and record license plates.  *Id.* at 119:24–120:12.  The Flock alert that

Officer Wamsganz received indicated that the license plate of a vehicle traveling westbound near

Delmar Boulevard in University City, Missouri, matched the license plate of a wanted vehicle.

*See id.* at 156:12–157:12.

Officer Johnson did not receive this Flock alert because he did not have a functioning

computer system in his police car at the time.  *Id.* at 165:20–166:6.  Officer Wamsganz, however,

notified Officer Johnson via cellphone of the Flock alert, relayed the information from the Flock

alert to Officer Johnson, and told Officer Johnson that the wanted was active.  *Id.* at 166:7–12.

Specifically, Officer Wamsganz provided Officer Johnson with the vehicle description, including

its license-plate number; the charge listed on the wanted; the caution codes regarding Lewis; and

Lewis's address.  *See id.* at 120:20–23, 124:20–22, 139:23–25, 158:21–22.

Officer Johnson then spotted the suspected Jeep traveling west on Delmar Boulevard and turning

south on Big Bend Boulevard.  *Id.* at 157:8–9.  Officer Johnson confirmed that the license plate on

the Jeep matched the information from the wanted and then initiated a suspicious vehicle stop by

activating his lights and siren.  *Id.* at 157:10–12, 121:14–20.  Neither Officer Johnson nor Officer Wamsganz contacted the Creve Coeur Police Department to confirm the wanted before Officer Johnson initiated the stop.  *See id.* at 125:16–126:7, 135:16–20, 166:20–23.

Officer Johnson also testified regarding the events that occurred after he initiated the stop, and video evidence corroborates his testimony.  The Court therefore cites to both as it describes the events below.  After Officer Johnson activated his lights and siren, he observed the Jeep's driver leaning over and making furtive movements toward the passenger side of the Jeep.  *Id.* at 121:19–24.  On the recording, Officer Johnson says, "Oh, he's hiding something," about eight seconds after Officer Johnson initiated the stop.  Ex. 6 at 0:46–0:54.  The Jeep pulled into a parking lot near Pershing Avenue and Big Bend Boulevard and parked diagonally through several parking spots.  *Id.* at 1:00–1:20; doc. 62, Evid. Tr. at 149:7–10.  Officer Johnson followed the Jeep into the parking lot and parked behind it.  Ex. 6 at 1:00–1:36.  Officer Wamsganz entered the parking lot around the same time as Officer Johnson but from a different entrance.  *Id.*  Officer Wamsganz parked in front of the Jeep, slightly off to the left of the Jeep.  *Id.* at 1:30–1:36.

Officer Johnson treated the stop as a "felony stop . . . due to the nature of the wanted that had identified" Lewis as "armed and dangerous."  Doc. 62, Evid. Tr. at 124:13–16.  Officer Johnson directed the driver (whom he later identified as Lewis) to roll down his window, to put his hands out of the window, to open the door, and to step out of the Jeep.  Ex. 6 at 1:33–1:50.  After Officer Johnson told Lewis to exit the Jeep, Officer Johnson said, "Don't reach for anything bro." *Id.* at 1:52–1:56.  Officer Johnson's tone of voice elevated to a higher pitch and quicker pace as he told Lewis not to reach for anything.  *Id.*  Lewis exited the Jeep, appearing to have his keys and cell phone in his hands.  *Id.* at 1:56–2:00.  Lewis was the sole occupant of the Jeep, and he left the driver's door open when he exited the Jeep.  *Id.*

18

### b.    Arrest and search of Lewis

After Lewis exited the Jeep, Officer Johnson had Lewis walk backward toward him. *Id.* at 1:57–2:05. Lewis complied with Officer Johnson's orders and did not attempt to flee. Doc. 62, Evid. Tr. at 138:14–21. Officer Johnson approached Lewis with his weapon drawn. *Id.* at 140:9–12. Nevertheless, Officer Johnson immediately handcuffed Lewis, conducted a pat-down search for weapons (finding none), and retrieved Lewis's identification. *Id.* at 139:24–140:13. Video evidence shows that Officer Wamsganz then spoke with Lewis while Officer Johnson called the dispatch center to provide it with Lewis's pedigree information and confirm that the wanted for Lewis and the Jeep remained active. Ex. 6 at 2:56–6:04; Ex. 7 at 0:32–2:02. Within about a minute, the dispatch center confirmed that the wanted was active. Ex. 7 at 1:04–2:02. Officer Johnson immediately arrested Lewis after receiving the confirmation. *Id.* Based on Officer Johnson's dash-camera video recording, about 5 minutes and 15 seconds elapsed from the time Lewis was stopped and directed to exit the Jeep until Officer Johnson arrested him. Ex. 6 at 0:46–6:01.

Officer Johnson testified that, at the time of the arrest, no one from the University City Police Department had communicated with the Creve Coeur Police Department about the wanted. Doc. 62, Evid. Tr. at 125:16–126:7, 135:16–20. According to Sergeant Martin from the Creve Coeur Police Department, however, if another police department encounters the person in the wanted, the encountering agency is supposed to conduct a "ten-minute hit" inquiry to determine if the wanted is still active. *Id.* at 103:20–24. Upon receiving a "hit," the Creve Coeur Police Department would have an officer "pull the form, compare the information on the form to the information on the ten-minute hit, and then . . . confirm or deny that . . . the wanted is active." *Id.*

at 104:3–13. Part of the Creve Coeur Police Department's review includes confirming that probable cause exists for the arrest. *Id.* at 104:14–22.

After the arrest, Officer Johnson and another officer moved Lewis to the other officer's vehicle. Ex. 7 at 2:00–2:23. The other officer searched Lewis's person and recovered a small, knotted bag of what appeared to be a drug, from Lewis's right pocket. Ex. 7 at 2:23–3:10. The other officer placed Lewis in his police car for transportation to the station. *See id.* at 3:04–3:10.

### c.    Dog sniff of the Jeep

Officer Wamsganz, at about the same time that Officer Johnson arrested Lewis, returned to his car to retrieve Ryno the police dog to conduct a sniff test around the Jeep. *Id.* at 2:06–2:08; Ex. 6 at 6:07–6:58; doc. 62, Evid. Tr. at 158:4–6. As a result, Officer Wamsganz was not within hearing distance when Officer Johnson and the other officer found the drugs on Lewis, and no one told Officer Wamsganz that an officer had found drugs on Lewis. *See* doc. 62, Evid. Tr. at 127:6–8, 136:2–5, 158:15–20. The dash-camera video recording shows Officer Wamsganz don gloves, remove Ryno from his police car, and lead Ryno to an area away from the Jeep so that the dog could void his bladder. Ex. 6 at 6:07–7:10; doc. 62, Evid. Tr. at 159:16–19. Officer Wamsganz and Ryno then walked to the Jeep to conduct the dog sniff. Ex. 6 at 7:10–7:20.

They began the sniff test at the front side of the Jeep and then Ryno moved to the open driver's door. *Id.* at 7:20–7:28. Ryno lay down next to the open door of the Jeep, signaling that he had detected the scent of narcotics. *Id.* at 7:28–7:31; doc. 62, Evid. Tr. at 161:2–4. Officer Wamsganz then rewarded Ryno with a toy. Ex. 6 at 7:31–7:41. Based on the video evidence, Ryno's alert occurred after the officers searched Lewis. *Id.* at 7:28; Ex. 7 at 2:24–3:30 (showing the search of Lewis and Ryno's alert).

20

Officer Wamsganz also testified regarding Ryno's training.  Officer Wamsganz was the second officer to work with Ryno and took on that responsibility in late October or early November 2020.  Doc. 62, Evid. Tr. at 151:18–21, 173:7–10.  After their two-week period of bonding and obedience training, Officer Wamsganz and Ryno completed a six-week program at a K-9 training academy operated by the American Mantrailing, Police and Work Dog Association. *Id.* at 151:24–152:15.  Officer Wamsganz and Ryno successfully completed the six-week program and passed a certification test, which resulted in American Mantrailing certifying Ryno as a dual-purpose K-9.  *Id.* at 153:10–154:4.  A dual-purpose K-9 certification includes certification in narcotic detection, tracking, suspect apprehension, and things of that nature.  *Id.* at 154:2–7.  Since the initial certification, Officer Wamsganz and Ryno have attended additional training sessions, held by American Mantrailing, every other week.  *Id.* at 154:8–16.  Each additional training session lasts eight hours.  *Id.*  Officer Wamsganz and Ryno have also annually completed a recertification process through American Mantrailing, including on April 4, 2022.  *Id.* at 154:20–23; Ex. 11.

American Mantrailing's training sessions include training the dog to detect narcotics.  *See* doc. 62, Evid. Tr. at 154:2–19.  Lewis objects to the R&R on the basis that the R&R failed to consider certain facts regarding Ryno's training regarding the command Officer Wamsganz gives Ryno and failed to consider why Ryno alerts.  Doc. 70 at 9.  As explained below, the Court overrules this objection in part and sustains it in part.

First, Lewis correctly claims that the R&R did not find as a fact that Officer Wamsganz gives Ryno the command "Narc," *see* doc. 69, and that the record supports this fact, doc. 62, Evid. Tr. at 163:23–25.  The Court therefore sustains his objection on that fact issue and finds as a fact

that Officer Wamsganz provides Ryno with the command "Narc" to trigger Ryno to search for narcotics.  *See* doc. 70 at 9; doc. 62, Evid. Tr. at 163:23–25.

Second, Lewis claims that the R&R failed to consider that "Ryno was trained to alert whenever his handler commanded him to do so." Doc. 70 at 9–10 (citation omitted).  The R&R did not consider this alleged fact, *see* doc. 69, but for good reason:  the record does not support it.  The record demonstrates that Ryno is trained to lie down if he detects the scent of narcotics, including the residual scent of narcotics, not simply because his handler commanded him to do so.  Doc. 62, Evid. Tr. at 164:1–3, 169:1–10.  The Court therefore overrules Lewis's objection.

Finally, Lewis claims that "Ryno's handler presumably rewards him *every time* that he lies down in the field." Doc. 70 at 9 (citations omitted).  Upon review of the record, the Court sustains Lewis's objection on this fact issue and finds as a fact that Officer Wamsganz, Ryno's handler, rewards Ryno with a ball when Ryno lies down in the field to signal that he has detected the scent of narcotics.  Doc. 62, Evid. Tr. at 163:23–164:5.  Further, the Court finds that, during training, Officer Wamsganz "attempt[s] to locate where the narcotics are that [Ryno is] alerting to because [Officer Wamsganz does not] want to reward [Ryno] for bad behavior." *Id.* at 173:15–18.

During training sessions and the recertification process, American Mantrailing has the dog conduct some narcotic-detection tests in blank rooms, i.e., rooms that do not have and have not had any narcotics within them.  *See id.* 162:10–15.  In the blank rooms, Ryno has falsely alerted three or four times in blank rooms between the time of his initial certification and the date of the evidentiary hearing, but Ryno did not falsely alert in a blank room during his April 2022 recertification test.  *Id.* at 162:10–15, 170:11–12, 173:2–22.

### d.    Search of the Jeep

Video evidence shows that, as Ryno alerted to the scent of narcotics near the Jeep, Officer Johnson said that he saw Lewis hiding something when he initiated the traffic stop.  Ex. 7 at 3:30–3:40.  Ryno then alerted, and the officers searched the Jeep.  *Id.*; Ex. 8.  Officer Johnson began by searching the driver's door, but he did not find any narcotics.  *Id.* at 0:00–0:13.  He did find an open beer bottle in the middle console area.  *Id.* at 0:13–0:22; doc. 62, Evid. Tr. at 136:18–19.  Officer Johnson told Officer Wamsganz to check the glovebox because he thought that he saw Lewis putting something in there.  Ex. 8 at 0:32–0:34.  Officer Wamsganz tried to open the glovebox to no avail:  it was locked.  *Id.* at 0:35–39.  Officer Johnson said that he thought the glovebox would be locked because he saw Lewis reaching in that area.  *Id.* at 0:40–0:49.  This statement was consistent with Officer Johnson's direction to Lewis not to "reach for anything bro" at the outset of their encounter, and with Lewis's having had his keys in his hands when he exited the Jeep.  *Id.*; Ex. 6 at 1:52–1:56.  Officer Johnson then used the key that he took from Lewis to open the glovebox, in which he discovered a pistol with an extended magazine and a baggie of suspected narcotics.  Ex. 8 at 1:00–1:24.

At some point after Lewis's arrest, Lieutenant Davis decided to tow the Jeep.  Doc. 62, Evid. Tr. at 145:4–6.  The University City Police Department commonly conducts a K9 sniff of a vehicle after a person has been arrested and there has been a decision to tow.  *Id.* at 144:11–13.

### 3.    Communication between the University City Police Department and the Creve Coeur Police Department

The record contains some evidence that the University City Police Department contacted the Creve Coeur Police Department about Lewis and the wanted.  Sergeant Martin testified that the Creve Coeur Police Department received a request to confirm the wanted after she began her shift at 6:00 p.m. on April 26, 2022.  *Id.* at 105:2–21.  The record is not clear regarding when this

request occurred.  As found above, Officer Johnson and Officer Wamsganz testified that no one from the University City Police Department contacted the Creve Coeur Police Department before Officer Johnson arrested Lewis.  The Court further finds that Sergeant Martin could not remember "exactly" when the request came but testified that "it wasn't that far into [her] shift after 6:00 PM that the wanted was confirmed."  *Id.* at 105:18–21.  Based on this evidence, the Court finds that the University City Police Department contacted the Creve Coeur Police Department to confirm the wanted after Lewis was arrested.  The Court also finds that Officer Mooney confirmed the probable cause for the wanted but did not transmit the probable-cause statement to the University City Police Department.  *Id.* at 105:5–10.

      **B.**    **Procedural background**

     In July 2022, a grand jury indicted Lewis on four counts:  two counts of possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1), one count of possessing a controlled substance with the intent to distribute in violation of 21 U.S.C. § 841(a)(1), and one count of possessing a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).  Doc. 1.  These charges stem from the interactions Lewis had with police officers in in Pagedale and University City.  *See* doc. 62.  As found above, Lewis made statements to the police during those interactions without receiving a *Miranda* warning, and the police obtained other evidence (firearms and drugs) from Lewis's person, the Toyota, and the Jeep.  *Id.*  Lewis has filed a motion to suppress the statements and other evidence.  Doc. 29.

     The Court referred Lewis's pretrial motions to Judge Bodenhausen pursuant to 28 U.S.C. § 636(b).  *See* doc. 6.  He held an evidentiary hearing, doc. 54, and then issued an R&R detailing his factual findings, legal conclusions, and recommendations on Lewis's pretrial motion, doc. 69.  He recommends that the Court deny Lewis's motion to suppress.  *Id.*  Lewis now objects to Judge

Bodenhausen's recommendation. Doc. 70. The United States opposes Lewis's objections and urges the Court to adopt Judge Bodenhausen's R&R in full. Doc. 72.

## II.    Standard

When a party objects to a magistrate judge's R&R, the district judge must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objected. *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003). In making its de novo determination, the Court reviewed the record related to Lewis's motion. Docs. 29, 39, 45, 55–56, 61–62, 65, 68–69, 70, 72–73. The Court also reviewed all admitted exhibits.

## III.    Discussion

Lewis's motion to suppress relates to evidence obtained during both the Pagedale and University City incidents. *See* doc. 29. The R&R concluded that the officers constitutionally obtained the evidence during both incidents, and therefore recommended that the Court deny Lewis's motion. Doc. 69. Lewis objects to several of the R&R's legal conclusions. *See* docs. 70, 73. Below, the Court addresses Lewis's objections as it considers (A) whether the Court should suppress evidence obtained during the Pagedale incident and (B) whether the Court should suppress evidence obtained during the University City incident.

### A.    The Pagedale incident

Lewis's first set of objections relate to the incident that occurred on April 18, 2022, when Lewis encountered three Pagedale police officers at the Midwest BankCentre. *See, e.g.*, doc. 62, Evid. Tr. at 13:12–19, 14:10–12, 47:22–48:12, 66:16–22. Lewis seeks to suppress the statements he made to Sergeant Rice and the evidence Sergeant Rice obtained from the Toyota. Doc. 29.

Whether the Court should suppress this evidence boils down to two questions. First, whether the Pagedale police had Lewis in custody when Sergeant Rice questioned him. Second, whether Sergeant Rice constitutionally conducted an inventory search of the Toyota. The R&R recommends finding that the Pagedale Police Department did not have Lewis in custody when he made the statements, and that Sergeant Rice conducted a constitutional inventory search. Doc. 69 at 12–23. Lewis objects to both conclusions. Doc. 70 at 3–8. The Court considers each question below.

### 1.    Whether the Pagedale police had Lewis in custody when Sergeant Rice questioned him

The R&R determined that "a reasonable person in Lewis's position would not believe [his] freedom of movement was restrained to a degree akin to a formal arrest when [Sergeant] Rice asked Lewis if he made a threatening statement to the bank security guard." Doc. 69 at 18 (citation omitted). As a result, the fact that Sergeant Rice did not give Lewis a *Miranda* warning before questioning him does not necessitate suppression of Lewis's statements. *See id.* Lewis objects to this conclusion, arguing that the R&R incorrectly analyzed whether, under the totality of the circumstances, a reasonable person would have believed that he was in custody. *See* doc. 70 at 4–5.

Specifically, Lewis claims that the R&R improperly considered two of the factors set forth in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), when determining whether, based on the totality of the circumstances, the Pagedale Police Department had Lewis in custody when Sergeant Rice questioned Lewis about his interactions with the security guard. Doc. 70 at 4–5. To determine whether police officers had someone in custody, the Court must consider the totality of the circumstances. *United States v. Ferguson*, 970 F.3d 895, 901 (8th Cir. 2020). Courts in the

Eighth Circuit consider the *Griffin* factors when making this determination. *Id.* Those factors include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of questioning.

*Id.* (quoting *Griffin*, 922 F.2d at 1349). On de novo review, the Court finds that the R&R correctly analyzed all *Griffin* factors.

First, the R&R correctly found that the first factor weighs in favor of Lewis because "[a]lthough the officers both testified that Lewis was free to leave, they did not inform him that he could leave or that he was not under arrest." Doc. 69 at 17; *see also* doc. 62, Evid. Tr. at 30:13–31:3, 67:12–68:2, 79:24–80:8.

Second, and relevant to Lewis's objections, the R&R correctly concluded that the second factor weighs strongly in favor of the United States. The R&R accurately stated:

> Lewis was not restrained prior to, or at the time, he made the alleged incriminating statement. While it is true that he was not allowed to go into or towards the bank, he otherwise retained all of his freedom of movement. Such a minor limitation in no way suggests that Lewis was in custody.

Doc. 69 at 17. In addition, the Court finds that the location of Lewis, the Toyota, the officers, and their police cars supports that Lewis had retained his freedom of movement. For example, the officers' police cars did not block any means of egress for Lewis and the Toyota. Ex. 2; doc. 62, Evid. Tr. at 16:18–21, 18:2–22, 29:21–25, 65:2–4. Thus, the evidence strongly supports that Lewis "possessed unrestrained movement during questioning." *Ferguson*, 970 F.3d at 901 (quoting *Griffin*, 922 F.2d at 1349).

27

Third, the Court finds that the R&R correctly concluded that "[t]he third factor favors the" United States "slightly, if it favors either party." Doc. 69 at 17. As the R&R explained, "[a]lthough Lewis did not initiate contact with the police, the record reflects that his interactions were voluntary when the police spoke with him about the situation at the bank." *Id.* While Lewis spoke with the officers, the officers allowed Lewis to move around, and they did not handcuff Lewis or put him in a police car. *See, e.g.*, doc. 62, Evid. Tr. at 19:24–25, 22:9–13, 23:13–17, 24:4–7, 30:17–19.

Fourth, the R&R correctly found that "[t]he fourth factor weighs heavily in favor of the" United States. Doc. 69 at 17. The Court agrees with the R&R's analysis on this factor:

> If anything, the police response was understated; they were responding to a silent alarm at a bank, and shortly after arriving a security guard confirmed that Lewis was the subject of concern. Yet the officers did not physically restrain Lewis or pat him down until after they had conducted a more detailed investigation of the situation, even though Lewis made some movements towards his waist or pants near the outset of the encounter. Furthermore, it is clear from the record that the officers did not use any deceptive or strong-arm tactics during their interactions with Lewis.

*Id.*; *see also, e.g.*, doc. 62, Evid. Tr. at 13:17–14:3, 14:10–12, 19:24–25, 20:13–21:5, 22:9–13, 23:13–17, 24:4–7.

Finally, the Court finds that the R&R also correctly concluded that the fifth factor— whether the atmosphere of the questioning was police dominated—is either neutral or weighs slightly in favor of the United States. Doc. 69 at 17. "Although there were three officers present, the entire encounter occurred outdoors, in a public place, and Lewis was permitted to speak freely and provide his side of events." *Id.* Sergeant Rice and Lewis, as one would expect in an outdoor setting, stood next to one another as they spoke. Doc. 62, Evid. Tr. at 42:17–21. Moreover, the fact that Sergeant Rice "may have had his hand on [Lewis's] back," *id.*, does not persuade the Court that the fifth factor is not "neutral or" that it may not "slightly favor" the United States, doc. 69 at 17.

28

Having considered the totality of the circumstances, including all *Griffin* factors, de novo, the Court overrules Lewis's objection and adopts the R&R's conclusion.

>    **2.      Whether Sergeant Rice conducted a constitutional inventory search of the Toyota**

Next, the Court must consider whether Sergeant Rice conducted a constitutional inventory search of the Toyota.  "'[A]n inventory search must be reasonable under the totality of the circumstances'; therefore, law enforcement may not use an inventory search as 'a ruse for general rummaging in order to discover incriminating evidence.'"  *United States v. Williams*, 39 F.4th 1034, 1043 (8th Cir. 2022) (quoting *United States v. Nevatt*, 960 F.3d 1015, 1020 (8th Cir. 2020) (per curiam)).  The Court considers an inventory search "reasonable" when police officers conduct it "according to standardized police procedures, which generally 'remove the inference that the police have used inventory searches as "a purposeful and general means of discovering additional evidence of a crime."'"  *Id.* (quoting *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011)).  Under this standard, the R&R concluded that Sergeant Rice conducted a reasonable, and therefore constitutional, search of the Toyota.  Doc. 69 at 18–23.

Lewis objects to this conclusion, claiming that the R&R misinterpreted Missouri law, Sergeant Rice deviated from the policy when conducting the search, the R&R ignored evidence of pretext, and the R&R failed to consider Lewis's arguments in combination.  Doc. 70 at 5–8.  On de novo review, the Court finds that the R&R correctly set forth and applied the applicable law, considered all relevant evidence, and correctly found that Sergeant Rice conducted a constitutional inventory search of the Toyota.  Doc. 69 at 18–23.  The Court therefore overrules Lewis's objection and adopts and incorporates the R&R in full on this issue.

In addition, the Court notes that, under the circumstances surrounding this tow, the Pagedale tow policy required the officers to tow the Toyota.  The policy includes a general

provision that says, "A vehicle may be towed . . . [i]ncident to arrest." Ex. 4 at 2. The policy, however, later mandates towing incident to arrest if the arrestee was the operator of the car: "When a person who was operating a motor vehicle is arrested, the vehicle shall be towed." *Id.* at 6. Here, "it is undisputed that Lewis . . . was the vehicle operator prior to his arrest." Doc. 69 at 20; *see also* doc. 70 (failing to object to the R&R regarding this fact). Thus, Sergeant Rice had to tow the Toyota after Lewis was arrested. That Sergeant Rice lacked discretion in this situation further undermines Lewis's assertion that Sergeant Rice's failure to investigate whether a third party could remove the vehicle evidences pretext for the search.

  **B.      The University City incident**

Lewis's second set of objections relate to an incident that occurred in University City on April 26, 2022. Doc. 70 at 8–12. That day, the University City police initiated a traffic stop of the Jeep based on a wanted issued by the Creve Coeur Police Department, arrested and searched Lewis, and searched the Jeep. *See, e.g.*, doc. 62, Evid. Tr. at 119:4–23, 121:14, 126:8–18, 136:16–17. Lewis seeks to suppress the evidence the University City police obtained from his person and the Jeep. Doc. 29 at 10–14.

Whether the Court should suppress this evidence turns on three questions: (1) whether Officer Johnson constitutionally conducted a traffic stop of the Jeep; (2) whether Officer Johnson and Officer Wamsganz constitutionally searched the Jeep; and (3) whether Officer Johnson constitutionally arrested Lewis. For each of these questions, the R&R found that the officers acted constitutionally. Doc. 69 at 24–28. Accordingly, the R&R recommended that the Court deny Lewis's motion to suppress evidence obtained from the search of the Jeep and the search incident to arrest. *Id.* Although Lewis objects only to the R&R's conclusions on the second and third questions, the Court reviews each below. Doc. 70 at 8–12.

### 1.    Whether Officer Johnson constitutionally stopped the Jeep

First, the Court must consider whether Officer Johnson constitutionally stopped the Jeep. The R&R concluded that Officer Johnson did constitutionally stop the Jeep under *Terry v. Ohio*, 392 U.S. 1 (1968), because Officer Johnson had reasonable suspicion based on the Creve Coeur wanted to conduct a traffic stop.  Doc. 69 at 24–28.  Lewis does not object to this conclusion.  *See* docs. 70, 73.  On de novo review, the Court finds that the R&R correctly set forth and applied the applicable law on this issue.  The Court therefore adopts and incorporates the R&R's recommendation on this issue.  Doc. 69 at 24–28.

### 2.    Whether the officers constitutionally searched the Jeep

Next, the Court must consider whether the officers constitutionally searched the Jeep.  The R&R concluded that, under the automobile exception to the Fourth Amendment's warrant requirement, the officers constitutionally searched the Jeep.  Doc. 69 at 28–33.  Lewis objects to this conclusion, arguing that the R&R failed to consider significant facts and that "no reasonably prudent person would rely on Ryno to establish probable cause."  Doc. 70 at 9–10.  As explained below, the Court finds on de novo review that the R&R correctly concluded that the officers constitutionally searched the Jeep.

First, the Court considers the timing of the dog sniff.  The R&R concluded that the timing of the dog sniff was constitutional under *United States v. Hensley*, 469 U.S. 221 (1985).  Doc. 69 at 29–30.  Lewis does not object to this conclusion.  *See* docs. 70, 73.  On de novo review, the Court finds that the R&R correctly set forth and applied the applicable law on this issue.  The Court therefore adopts and incorporates the R&R's recommendation and conclusion.  Doc. 69 at 29–30.

Second, because the timing of Ryno's sniff was constitutional, the Court considers whether Ryno's alert provided probable cause to search the Jeep.  Here, too, the Court finds that the R&R

31

correctly set forth and applied the applicable law.  "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Rederick*, 65 F.4th 961, 967 (8th Cir. 2023) (alteration in original) (quoting *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010)).  The Court considers "[a] drug detection dog" to be "reliable when it has been 'trained and certified to detect drugs.'"  *Id.* at 967 (quoting *Winters*, 600 F.3d at 967).  Further, the Court "presume[s] (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search" "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting."  *Id.* (quoting *Florida v. Harris*, 568 U.S. 237, 246–47 (2013)).  When determining whether a dog's alert provided probable cause, the Court must consider the totality of the circumstances and apply a "flexible, common-sense standard."  *Id.* at 968 (first quoting *Harris*, 568 U.S. at 240; and then citing *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016)).

Under this standard, the R&R concluded that Ryno was certified by a bona fide organization, American Mantrailing, and that Ryno is reliable and has gone through consistent and regular training.  Doc. 69 at 30–32.  Lewis does not object to the R&R's conclusion that American Mantrailing is a bona fide organization, *see* docs. 70, 73, and the Court agrees with the R&R that it is.  Thus, Ryno "is presumptively reliable at detecting illicit drugs—and [his] alert establishes probable cause for [the] search."  *United States v. Collier*, 2024 WL 4097352, at *2 (8th Cir. 2024) (citing *Harris*, 568 U.S. at 246–47).

Lewis attempts to overcome this presumption by objecting to the R&R's conclusion that Ryno is reliable.  Lewis claims that (1) "the Magistrate Judge failed to consider facts which militated against probable cause—namely, the fact that Ryno was trained to alert whenever his handler commanded him to do so" and (2) "after considering evidence of Ryno's training, no

reasonably prudent person would rely on Ryno to establish probable cause." Doc. 70 at 9–10 (citation omitted). The Court disagrees.

As found in section I(A)(ii)(2)(c), Ryno has gone through significant training in narcotic detection. He completed a six-week original certification process in January 2021, participated in additional narcotic-detection training every other week since the original certification, and successfully completed a recertification process in April 2022, around three weeks before the incident in question. Doc. 62, Evid. Tr. at 151:24–152:2, 153:10–154:23; Ex. 11. Through that process, Ryno was trained to *search* for narcotics upon receiving the Narc command and then, after searching, to lie down if he detects the scent of narcotics. Doc. 62, Evid. Tr. at 163:23–164:3, 169:1–10. He was *not* trained to alert simply on the "Narc" command. *Id.*

Further, Officer Wamsganz trains Ryno in a way that ensures that he does not reward Ryno for false alerts. After Ryno alerts to the scent of narcotics during the training sessions, Officer Wamsganz tries to locate the drugs before rewarding Ryno for an alert. *Id.* at 173:15–18. Throughout his training, Ryno falsely alerted only three or four times in blank rooms between January 2021 and March 7, 2024. *Id.* at 173:2–174:1. Officer Wamsganz's process of searching first, rewarding second during training sessions and Ryno's track record during training sessions demonstrate Ryno's reliability when he alerts to the scent of narcotics in real-life situations. Moreover, Ryno demonstrated his reliability during his recertification process in April 2022: Ryno did not alert in any blank rooms. *Id.* at 170:9–12.

Based on its review of the record, the Court finds that Lewis has failed to show, through cross-examination or opposing evidence, "the inadequacy of [the] certification or training program or that the circumstances surrounding [Ryno's] alert undermined the case for probable cause." *Collier*, 2024 WL 4097352, at *2 (first alteration in original) (quoting *United States v. Perez*, 29

33

F.4th 975, 986 (8th Cir. 2022)).  The Court therefore finds that the totality of the circumstances

demonstrates that Ryno's "sniff [was] up to snuff":  Ryno is a properly trained and reliable drug

dog.  *Harris*, 568 U.S. at 248.  Thus, Ryno's alert provided probable cause to search the Jeep.

Further, the Court agrees with the R&R that, even without Ryno's alert, the officers had

probable cause to search the Jeep.  Doc. 69 at 34.  As explained in detail below, the Court finds

that the officers constitutionally arrested and searched Lewis.  *See infra* Section III(B)(3).  When

they searched Lewis, Officer Johnson and another officer discovered what appeared to be a baggie

of drugs.  Ex. 7 at 2:23–3:10.  That discovery occurred before Ryno conducted his sniff and before

Officer Johnson and Officer Wamsganz searched the Jeep.  *Id.* at 2:23–3:30.  Thus, before Ryno

sniffed and before the officers searched the Jeep, Officer Johnson knew that (1) when he initiated

the traffic stop, Lewis had made a furtive movement toward the passenger side of the Jeep;

(2) when Lewis was exiting the Jeep, he made another furtive movement toward the passenger

side of the Jeep, leading Officer Johnson to say "Don't reach for anything bro"'; and (3) Lewis

had drugs on his person.  Doc. 62, Evid. Tr. at 121:19–24; Ex. 6 at 1:52–1:56; Ex. 7 at 2:00–3:10.

The Court has no doubt that, under these circumstances, a reasonably prudent person would have

thought that a search of the Jeep would reveal contraband or evidence of a crime.  *Harris*, 568

U.S. at 248.  Video evidence shows that Officer Johnson was the first person to begin searching

the Jeep.  Ex. 8 at 0:00–0:07.  Thus, based on the knowledge that Officer Johnson had, the search

of the Jeep was constitutional.

Accordingly, the Court holds that the officers had probable cause to search the Jeep,

rendering their search constitutional.  The Court therefore overrules Lewis's objection and adopts

the R&R's recommendation.

### 3.    Whether Officer Johnson constitutionally arrested and searched Lewis

Finally, the Court must consider whether Officer Johnson constitutionally arrested and searched Lewis.  Lewis claims that the Court must suppress drugs that Officer Johnson found on Lewis during a search incident to arrest because Officer Johnson did not have probable cause to arrest him based on the Creve Coeur Police Department's wanted.  Doc. 29 at 10–14.  The R&R recommends denying Lewis's motion to suppress the drugs found on him because (a) Officer Johnson had probable cause to conduct the arrest under *Furlow* and (b) even if Officer Johnson did not have probable cause to arrest Lewis, the good-faith exception to the exclusionary rule applies here.  Doc. 69 at 33–35.  Lewis objects to both conclusions.  Doc. 70 at 10–12.  Below, the Court first considers *Furlow* and then considers whether Officer Johnson constitutionally arrested and searched Lewis.  Although the Court concludes that Officer Johnson did constitutionally arrest and search Lewis, the Court considers, in the alternative, whether the good-faith exception to the exclusionary rule applies here.

### a.    *Furlow*

In *Furlow*, a 42 U.S.C. § 1983 case, the Eighth Circuit confronted a facial constitutional challenge to the St. Louis County Police Department's wanteds system and a claim that Dwayne Furlow and Ralph Torres had both been unconstitutionally arrested based on wanteds.  *See* 52 F.4th at 397–406.  The Court has carefully considered *Furlow* and its implications on Fourth Amendment claims that, like Lewis's claim, argue that an officer unconstitutionally arrested a defendant based on a wanted.  Below, the Court reviews (i) *Furlow*'s factual background; (ii) *Furlow*'s procedural background; (iii) *Furlow*'s holding regarding the facial constitutionality

of a wanteds system; and (iv) *Furlow*'s holding regarding qualified immunity. The Court then provides a summary of *Furlow*'s holdings.

### i.    *Furlow*'s factual background

Both Furlow and Torres were arrested based on wanteds that the St. Louis County Police Department issued. *Id.* at 398–99. The wanteds issued regarding Furlow and Torres and their subsequent arrests were distinct from one another.

Furlow's wanted stemmed from the response of Officers Christopher Partin and Kevin Walsh to a 911 call at Furlow's home. *Id.* at 399. After investigating the call, Officer Walsh entered a wanted for Furlow for domestic assault in the third degree and domestic peace disturbance. *Id.* A few days later, "Furlow was stopped for a traffic violation and was ultimately arrested on the outstanding [w]anted." *Id.*

Torres's wanted, on the other hand, came from Detective Laura Clements's investigation into Torres for child abuse. *Id.* Detective Clements was conducting a parallel investigation to the Department of Social Services's investigation into Torres for child abuse. *Id.* When her trail went cold, Torres entered a wanted for Torres. *Id.* About a month later, the Department of Social Services closed its investigation based on a finding of insufficient evidence. *Id.* Detective Clements, however, did not know that the investigation had concluded. *Id.* Her wanted for Torres therefore remained active. *Id.* Two days after the Department of Social Services closed its investigation, a police officer "was on patrol in the vicinity of Torres'[s] house and discovered [his] outstanding [w]anted." *Id.* The officer then "arrested Torres at his house." *Id.*

### ii.    *Furlow*'s procedural background

The district court concluded that qualified immunity shielded Officers Partin and Walsh and Detective Clements from civil liability for Furlow's and Torres's arrests. *Id.* at 400; *Furlow v.*

*Belmar*, Case No. 4:16CV254 HEA, 2018 WL 4853034, at *7–12 (E.D. Mo. Oct. 5, 2018).  On

appeal, Furlow and Torres asserted two primary arguments regarding their arrests:  (1) the St.

Louis County Police Department's wanteds system, in general, is facially unconstitutional, and

(2) even if the wanteds system is not facially unconstitutional, the officers were not entitled to

qualified immunity.  *See Furlow*, 52 F.4th at 400–06.

### iii.    *Furlow*'s holding regarding the facial constitutionality of the wanteds system

The *Furlow* majority first considered whether the wanteds system is unconstitutional on its

face.  *Id.* at 400–04.  To answer this question, as with any facial constitutional challenge, the

*Furlow* majority had to determine whether officers could constitutionally apply the wanteds

system in at least one situation.  Despite its palpable concerns with the wanteds system, *see, e.g.*,

*id.* at 397–98, 400–03, the *Furlow* majority concluded that the wanteds system does "encompass[]

situations that do not violate the Constitution, including those involving an arrest immediately

after an officer has entered a wanted, circumstances involving evanescent evidence, and incidents

involving a fleeing felon," *id.* at 404 (citations omitted).  "Because of the existence of these

constitutional applications," the *Furlow* majority held that the wanteds system is not

unconstitutional on its face.  *Id.*  To be clear, the *Furlow* majority did not hold that officers' use of

the wanteds system is constitutional in only the three situations it identified.  *See id.* at 400–04.

### iv.    *Furlow*'s holding regarding qualified immunity

The *Furlow* majority then considered whether qualified immunity shielded the officers

from civil liability.  *Id.* at 404–06.  This issue presents two questions:  (1) whether the officers'

actions violated a constitutional right, and (2) whether the right was clearly established.  *Id.* at 404.

For Officers Partin and Walsh, the officers who had responded to the call at Furlow's

house, the *Furlow* majority began its analysis with the clearly established prong.  *Id.* at 404–05.

The *Furlow* majority explained that the law clearly established that "a warrantless arrest prompted by a notice from one officer to another is unconstitutional unless:  (1) the arresting officer is able to make an independent finding of probable cause, . . . (2) the arresting officer has been working closely with the officer who made the initial and valid probable cause determination," or (3) an arrest falls within other collective-knowledge doctrine cases, such as *United States v. Briley*, 726 F.2d 1301 (8th Cir. 1984).  *See id.*

Having considered what the law clearly established, the *Furlow* majority turned to whether Furlow could hold Officers Partin and Walsh civilly liable for his arrest, which a third, unnamed officer made based on the wanted that Officer Walsh had issued.  *See id.* at 398–99, 404–05.  The *Furlow* majority explained that a collective-knowledge doctrine case, *Briley*, foreclosed the conclusion that Officers Partin and Walsh violated clearly established law.  *Id.* at 404–05.

In *Briley*, Geoffrey Briley appealed his conviction for bank robbery, claiming that his arresting officers lacked probable cause to arrest him.  726 F.2d at 1302.  Before the officers arrested Briley, an FBI agent received an anonymous tip that Briley had robbed a bank.  *Id.*  The agent conducted some investigation and then notified a local police department of what he knew.  *Id.*  The police department had an officer compile a photospread to show witnesses, and then that officer had three witnesses review the photospread.  *Id.*  Thereafter, an officer issued a "probable cause pickup" for Briley.  *Id.* at 1302–03.  A "probable cause pickup" is a notice that the police department provided all its officers at the beginning of their shift as part of the "Daily Operations Report."  *See id.*  Two officers later noted that Briley was listed on the Daily Operations Report and decided to find and arrest Briley.  *Id.* at 1303.  As the *Furlow* majority noted, these two officers "were not involved in issuing the pickup notice or part of a related investigation."  *Furlow*, 52 F.4th at 405.  Despite the attenuated transfer of information from the FBI agent who

had conducted the initial investigation to the police department to the officer who determined that probable cause existed to arrest Briley, and then to a group of officers (including the officers who made the arrest) at the beginning of a shift, the court concluded that the two arresting officers had probable cause for the arrest based on the collective knowledge of the arresting officers, the FBI agent, and other officers. *See Briley*, 726 F.2d at 1305–06.

The *Furlow* majority recognized that the *Briley* facts "align closely with the circumstances" involved in Furlow's arrest, casting doubt on—or, in the Court's view, completely foreclosing—the conclusion that Officer Partin's and Officer Walsh's actions violated clearly established law. *See Furlow*, 52 F.4th at 405. Thus, the *Furlow* majority concluded that qualified immunity shielded Officers Partin and Walsh from civil liability for Furlow's arrest based on a wanted. *See id.* at 404–06. While the *Furlow* majority forcefully expressed its concerns about the wanteds system, *Briley* and other collective-knowledge doctrine cases remain binding caselaw in the Eighth Circuit, and they apply when analyzing whether an officer had probable cause to conduct an arrest based on a wanted. *Id.* at 405 (citing *Briley*, 726 F.2d at 1301–03, 1305–06); *United States v. Meeks*, 639 F.3d 522, 529 (8th Cir. 2011) ("[O]ne panel of [the Eighth Circuit] cannot overturn the decision of another panel . . . .").

As to Detective Clements, the *Furlow* majority concluded that qualified immunity did not shield her from civil liability for Torres's arrest. *Furlow*, 52 F.4th at 405–06. The *Furlow* majority first explained that, like with Officers Partin and Walsh, *Briley* casts doubt on the conclusion that Detective Clements violated clearly established law. *Id.* at 405. Detective Clements did, however, violate other clearly established law—i.e., "probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect," *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (citations omitted), *see Furlow*, 52 F.4th at 405–06. The *Furlow*

39

majority explained that if Detective Clements had conducted minimal further investigation, she would have discovered "that probable case (or even arguable probable cause) had dissipated, leaving no continuing justification for the [w]anted." *Id.* (quoting *Kuehl*, 173 F.3d at 650).  Thus, because Detective Clements violated a clearly established constitutional right, the *Furlow* majority concluded that qualified immunity did not shield her from civil liability.  *Id.* at 404–06.

v.    <em><strong>Furlow</strong></em> <strong>in sum</strong>

In sum, *Furlow* held the following.  First, the wanteds system is not facially unconstitutional.  *Id.* at 404.  The majority based that holding on its conclusion that the wanteds system is constitutional when applied in situations "involving an arrest immediately after an officer has entered a wanted, circumstances involving evanescent evidence, and incidents involving a fleeing felon."  *Id.* (citations omitted).  Second, qualified immunity shielded Officers Partin and Walsh from civil liability because *Briley* foreclosed the conclusion that their actions violated clearly established law.  *Id.* at 405.  Third, qualified immunity did not shield Detective Clements from civil liability because "probable cause (or even arguable probable cause) had dissipated," and the detective could have determined that by "minimal further investigation."  *Id.* at 405–06 (quoting *Kuehl*, 173 F.3d at 650).

*Furlow* did not find any application of the wanteds system unconstitutional as to Furlow himself (as opposed to Torres).  *Briley* and other Eighth Circuit caselaw surrounding warrantless arrests and the collective-knowledge doctrine compel this conclusion, and as noted, remain good law.  *Meeks*, 639 F.3d at 529.  Finally, having found the wanteds system not facially unconstitutional, the *Furlow* court did not have before it the tall task of determining the constitutionality of *every* application of the wanteds system; it had before it only the issue of whether the officers in question enjoyed qualified immunity on the facts presented.  *Furlow*, 52

40

F.4th at 404–06. *Furlow* therefore did *not* hold that the wanteds was constitutional only in those applications that the majority identified in rejecting the facial constitutional challenge to the wanteds system. *See id.* at 400–04; *Meeks*, 639 F.3d at 529. Recognizing the concerns that the *Furlow* majority expressed in dicta about the wanteds system, however, district courts must carefully examine warrantless arrests based on wanteds under the relevant caselaw, including *Briley* and other collective-knowledge doctrine cases.

### b.    The constitutionality of Officer Johnson's actions

The Court now considers whether Officer Johnson constitutionally arrested and searched Lewis. As detailed in section I(A)(ii), Sergeant Martin issued a wanted after she determined that probable cause existed to arrest Lewis for harassment in the first degree. Doc. 62, Evid. Tr. at 95:3–11, 95:22–97:11. Lewis does not dispute that the information that Sergeant Martin had sufficed to establish probable cause. *See* docs. 29, 45, 65, 70, 73. After the wanted was entered into REJIS, Officer Wamsganz notified Officer Johnson that he had received a Flock alert that a wanted vehicle was traveling westbound near Delmar Boulevard. Doc. 62, Evid. Tr. at 137:22–138:9, 166:7–12. Officer Johnson began searching for the vehicle and found it traveling west on Delmar Boulevard and turning south on Big Bend Boulevard. *Id.* at 157:8–9. After stopping the vehicle, confirming that the wanted remained active and the Lewis was the person wanted, Officer Johnson arrested and searched Lewis. *Id.* at 157:10–12; Ex. 6 at 2:56–6:04; Ex. 7 at 0:32–2:02.

After careful consideration of the record, *Furlow*, *Briley*, and the collective-knowledge doctrine, the Court finds that these circumstances demonstrate that Officer Johnson arrested Lewis based on probable cause. Although the transfer of information between the officer making the probable cause determination and the arresting officer was attenuated, like in *Briley*, the evidence demonstrates that Officer Johnson had probable cause to arrest Lewis under the collective-

knowledge doctrine. *Briley*, 726 F.2d at 1305–06. The Court, therefore, holds that Officer Johnson constitutionally arrested and searched Lewis. Thus, the Court overrules Lewis's objection and adopts the R&R's recommendation.

### c.    The good-faith exception

In the alternative, the Court considers whether the Court should deny Lewis's motion to suppress under the good-faith exception to the exclusionary rule. As explained below, the Court concludes that the good-faith exception applies in this case.

The exclusionary rule—"undoubtedly . . . a 'judicially created remedy' of [the Supreme] Court's own making"—requires the Court to suppress evidence obtained in violation of the Fourth Amendment "to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–38 (2011) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). But, because "the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue," the Supreme Court has created exceptions to this remedy, including the good-faith exception. *Id.* at 238 (alteration in original) (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)).

The good-faith exception recognizes that "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . the 'deterrence rationale loses much of its force.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 909, 919 (1984)). The Court has accordingly applied the good-faith exception in several contexts. *See, e.g.*, *Leon*, 468 U.S. at 922–23 (holding that, under the good-faith exception, the exclusionary rule does not apply when the police conducted a search in "objectively reasonable reliance" on a warrant later held invalid); *Illinois v. Krull*, 480 U.S. 340, 349–55 (1987) (applying the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes). As is relevant here, the

42

Court has held that the exclusionary rule does not apply "when the police conduct a search in objectively reasonable reliance on binding appellate precedent." *Davis*, 564 U.S. at 249–50.  The question in this case therefore is whether Officer Johnson searched Lewis incident to an arrest in objectively reasonable reliance on binding appellate precedent.

In answering this question, the Court finds three collective-knowledge-doctrine cases particularly relevant here:  *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560 (1971), *Hensley*, and *Briley*.

In *Whiteley* and *Hensley*, "the Supreme Court explained how one officer could pass probable cause on to another," thereby recognizing the collective-knowledge doctrine.  *Furlow*, 52 F.4th at 411–12 (Stras, J., concurring in part and concurring in the judgment).  In *Whiteley*, a police department obtained an arrest warrant and then issued a radio bulletin to another department, which then relayed the communication to a third department.  401 U.S. at 563–64.  The Court held that the warrant-obtaining police department lacked probable cause to obtain a warrant, but stated:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin.  Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.  Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

*Id.* at 568.  Thus, as the *Hensley* court later recognized:

> *Whiteley* supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest.  It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.

469 U.S. at 231 (emphasis in original).  The *Hensley* court relied on this principle to conclude that officers may rely on "a flyer or bulletin [that] has been issued on the basis of articulable facts

supporting a reasonable suspicion that the wanted person has committed an offense" to conduct a stop. *Id.* at 232 (citation omitted). Similarly, and as discussed above, the Eighth Circuit applied the collective-knowledge doctrine in *Briley*.

Factually, this case falls somewhere between *Whiteley* and *Hensley*: the Creve Coeur Police Department (which issued the wanted) did not have a warrant to arrest Lewis, like the bulletin-issuing officers in *Whiteley* did, but the department issued the wanted based on probable cause, which exceeds the reasonable suspicion on which police officers premised the flyer in *Hensley*. This case does, however, align closely with *Briley*: both involved an officer communicating that he had probable cause to arrest a person via a system that (1) lacked direct communication between the first officer and the second officer (instead, the officers used a medium to transmit the information) and (2) lacked the transmission of the details that established probable cause. Thus, although pre-*Furlow* caselaw did not specifically authorize an officer to arrest and search someone based on a *wanted*, *see Davis*, 564 U.S. at 241 (applying the good-faith exception when binding precedent "specifically authorize[d]" the conduct at issue (emphasis removed)), *Whiteley*, *Hensley*, and *Briley* show that Officer Johnson's arrest and search of Lewis occurred in objectively reasonable reliance on binding appellate precedent. *Cf. Furlow*, 52 F.4th at 405 (granting qualified immunity to two officers because of the factual similarity between the wanted-based arrest involved in *Furlow* and the arrest involved in *Briley*).

Having found on de novo review that the good-faith exception applies here, the Court overrules Lewis's objection and adopts the R&R's recommendation.

### d.    Other arguments

When addressing whether the officers constitutionally arrested and searched Lewis, the United States included in its response brief (i.e., its third and final brief on this issue) two new

arguments:  (1) the inevitable-discovery doctrine applies here and (2) the delay in seeking confirmation of the wanted occurred because Lewis had to be booked and processed based on the charges related to evidence obtained from his Jeep.  Doc. 72 at 10–11.  The United States neither included caselaw nor cited facts supporting these arguments, and raised them for the first time in reply.  *See id.*  The Court therefore declines to consider these arguments.

## IV.   Conclusion

The Court sustains, adopts, and incorporates United States Magistrate Judge John Bodenhausen's [69] Report and Recommendation subject to the modifications discussed above. The Court overrules in part and sustains in part Lewis's [70] Objection to the Report and Recommendation and denies Lewis's [29] Motion to Suppress Statements and Physical Evidence.

So ordered this 17th day of September 2024.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE